1

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    BOB BARR and WAYNE A. ROOT, et      )
     al,                                 )
5                          Plaintiffs,   )
                                         )
6                                        )  CA No. 08-11340-NMG
     vs.                                 )
7                                        )
                                         )
8    WILLIAM F. GALVIN,                  )
                           Defendant.    )
9

10

     BEFORE:  THE HONORABLE NATHANIEL M. GORTON
11

12

                 HEARING ON MOTION FOR PRELIMINARY INJUNCTION
13

14

15

                 John Joseph Moakley United States Courthouse
16                        Courtroom No. 4
                          One Courthouse Way
17                        Boston, MA 02210
                          Friday, September 12, 2008
18                            2:12 p.m.

19

20

21                        Cheryl Dahlstrom, RMR
                          Official Court Reporter
22         John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 3209
23                        Boston, MA 02210
              Mechanical Steno - Transcript by Computer
24

25

1    APPEARANCES:

2        FOLEY HOAG LLP
         By:  Matthew C. Baltay, Esq.,
3             Amrish V. Wadhera, Esq., and
              Jennifer S. Behr, Esq.
4        155 Seaport Boulevard
         Boston, Massachusetts 02210-2600
5        - and -
         AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS
6        By:  John Reinstein, Esq.
         211 Congress Street
7        Boston, Massachusetts 02110
         On behalf of the Plaintiffs.

8
         OFFICE OF THE ATTORNEY GENERAL
9        By:  Amy Spector, Esq.,
              Julie B. Goldman, Esq., and
10            Timothy James Casey, Esq.
         One Ashburton Place
11       Room 2019
         Boston, Massachusetts 02108-1698
12       On behalf of the Defendant.

13

14

15

16

17

18

19

20

21

22

23

24

25

3

<pre>
  1                    P R O C E E D I N G S

  2            THE CLERK:  This is Civil Action 08-11340, Barr, et al

  3       vs. Secretary Galvin.  Counsel please identify themselves for

  4       the record.

  5            MR. BALTAY:  Good afternoon, your Honor.  For the

  6       plaintiffs, Matthew Baltay from Foley Hoag.

  7            THE COURT:  Mr. Baltay, good afternoon.

  8            MR. WADHERA:  Good afternoon, your Honor.  Amrish

  9       Wadhera, from Foley Hoag, for the plaintiffs.

02:12 10            THE COURT:  Mr. Wadhera, good afternoon to you.

 11            MS. BEHR:  Good afternoon, your Honor.  Jennifer Behr,

 12       also from Foley, for the plaintiffs.

 13            THE COURT:  Miss Behr.

 14            MR. REINSTEIN:  Good afternoon, your Honor.  John

 15       Reinstein, of the ACLU, for the plaintiffs.

 16            THE COURT:  Mr. Reinstein, good afternoon to you.

 17            MS. SPECTOR:  Good afternoon, your Honor.  Amy

 18       Spector, Assistant Attorney General, for the Secretary.

 19            THE COURT:  Miss Spector.

02:12 20            MS. GOLDMAN:  Julie Goldman, Assistant Attorney

 21       General, also for the Secretary.

 22            THE COURT:  Miss Goldman.

 23            MR. CASEY:  Good afternoon, your Honor.  Tim Casey,

 24       Assistant Attorney General, also on behalf of the Secretary.

 25            THE COURT:  Mr. Casey.  Good afternoon to you all.
</pre>

1        We are here on the plaintiffs' motion for a

2   preliminary injunction.  And I do -- am familiar with the

3   papers.  And what I'm going to do is to give the plaintiff

4   about 15 minutes to highlight for me what they think the

5   important issues are before me.  I do understand the position

6   of the representatives of Mr. Barr and Mr. Root of the

7   Libertarian Party of Massachusetts claiming that they ought to

8   have their names on the presidential ballot in November and the

9   reasons alleged by the Secretary of the Commonwealth, Mr.

02:13 10   Galvin, as to why they have not qualified with the requirements

11   of filing the number of signatures that they were bound to

12   file.

13        To guide you, however, before I let you speak -- and

14   as I say, I'm going to give the plaintiffs 15 minutes, the

15   defendants 15 minutes to respond and then a short rebuttal by

16   each side.  But I want you to address in the meantime some of

17   the questions that I have developed in reading the papers.

18        First, for the plaintiffs, if I understand the

19   timelines correctly, you gathered approximately 7,000

02:14 20   signatures before you were informed that substitution would not

21   be permitted and approximately 8,000 signatures thereafter.

22   Why did you continue collecting the Phillies-Bennett signatures

23   when you knew they would not be accepted in June of this year?

24   And if you collected 8,000 signatures in those two months,

25   would it really have been an unbearable burden to collect 2,000

1    more?

2           I'm not going to ask you to answer these questions

3    until you make your presentation, so I'm going to go through

4    the questions first, and then you can address them if you

5    desire at any point during the presentation.

6           The second question is for the plaintiffs.  The

7    signatures that you did collect are in support of Phillies and

8    Bennett.  Why should they be read to nominate Barr and Root

9    instead?  Would that not frustrate the intent of those 15,000

02:15 10   voters?

11           Finally, you attempt to distinguish the Davoren case

12   on the grounds that here there is "no policy" governing

13   substitution.  But the Elections Division told you that it

14   would not be permitted and that you needed to gather the

15   required signatures before the July 29th deadline.  Was that

16   not clear enough?

17           For the defendants, I would ask:  Is it your position

18   that there is no substitution mechanism at all for presidential

19   candidates or that any request for substitution is decided

02:16 20   solely by the Secretary of the Commonwealth with no bounds

21   whatsoever on his discretion?

22           Second, Miss Kristen Green informed the plaintiffs

23   that she could prepare a form on which they could request

24   candidate substitution.  Does such a form exist?  And if so,

25   why has it not provided -- why was it not provided to the

1     plaintiffs even if it would not have guaranteed approval?

2             And, finally, your office has characterized Doctor

3     Phillies as a "stand-in" candidate who was not seriously

4     seeking his party's nomination, a characterization which he

5     disputes.  Do you have any evidence to support your view?  And

6     how does such a designation affect the statutory analysis?

7             With that, I'll ask the plaintiffs to give their

8     presentation.  Will that be Mr. Baltay?

9             MR. BALTAY:  Yes, your Honor.

02:17 10             THE COURT:  Okay.

11             MR. BALTAY:  Thank you very much.  Your Honor, we are

12     here to address some significant constitutional issues, namely,

13     the rights of the Libertarian Party to ballot access and the

14     rights of the citizens of Massachusetts to vote for candidates

15     of their choosing.

16             The United States Supreme Court has certainly

17     affirmed, in the seminal Williams vs. Rhodes case, that the

18     twin constitutional rights of ballot access and the right to

19     vote "rank among our most precious freedoms and without these

02:17 20     the other rights, even the most basic ones, may be rendered

21     illusory."

22             I want to say at the outset, this is not a case about

23     10,000 signatures or the validity of the 10,000-signature

24     requirement.  On the contrary, the Libertarian Party has

25     secured 10,000 signatures.  They have been certified by the

1    town clerks and submitted to the Secretary.  There will be a

2    set of Libertarian candidates on the ballot.  So it's not about

3    the validity of the 10,000.  It's about something different.

4    It's about substitution.  Will the Libertarians be allowed to

5    substitute the correct candidates, or will the Secretary insist

6    that the incorrect candidates who did not receive the

7    nomination remain on the ballot?

8         I want to say a word about substitution.  Substitution

9    in political primaries and elections is a fact of life when

02:18 10   we're dealing with minor political parties.  The minor

11   political parties, unlike the Democrats and Republicans, are

12   required to operate within a certain time frame and get 10,000

13   signatures.  They can start in February and must end by July.

14        The major political parties, as we know, run a primary

15   season, and at the end of the convention, in late August, early

16   September, the candidates emerge.  The vice president is

17   tapped, and they get on the ballot.

18        The minor parties must operate, again, in this

19   different framework and begin collecting signatures relatively

02:19 20   early on and complete that process by July.  So they must

21   commit much earlier to who are the candidates going to be.  In

22   February, really, they must say here are the people who are

23   going to go out and have their names on the signature drive.

24        If the Democrats had to do that here in February, in

25   Massachusetts, Senator Clinton was the frontrunner and, in

1   fact, won the primary.  If the Democrats had to go with a

2   substitution scheme, they might have a problem but they don't,

3   the point being that for minor political parties that must

4   operate within the stricter timeline --

5       THE COURT:  If that -- using your analogy, if the

6   major parties did have to go through the same process that the

7   minor parties do, and Mrs. Clinton went out and helped get

8   15,000 signatures to put her name on the ballot, and then in

9   July we decided, oh, well, it's not going to be Mrs. Clinton,

02:20 10   it's going to be Mr. Obama and we'll just substitute the name

11   at the top, doesn't that completely disenfranchise the 15,000

12   people who thought they were signing a petition on behalf of

13   Mrs. Clinton when, in fact, they were signing one for Mr.

14   Obama?

15       MR. BALTAY:  No, your Honor.  We view the petition

16   drive as -- in the context of minor political parties, as a

17   party.  If you look at the statutory scheme, it provides that

18   major political parties who garnered 3 percent of the vote in

19   the last vote do not need to go through this.  Minor political

02:20 20   parties do.  So I view it as a party --

21       THE COURT:  Why doesn't the petition say, We petition

22   to have the candidate of the Libertarian Party, whoever he or

23   she may be, put on the ballot in November?  And then the 15,000

24   signatures are gathered in that context.  As opposed to, We

25   want Mr. Phillies and Mr. Bennett to be the candidate, and you

1    gathered 15,000 signatures on his -- or their behalf and then,

2    lo and behold, it's not Mr. Phillies and Mr. Bennett at all?

3             MR. BALTAY:  That could be a workable solution, your

4    Honor.  I know two things first.  The Libertarians did approach

5    the Secretary, through his attorneys, and said, How do we do

6    this?  And they said, Collect the signatures.  If you need to

7    substitute we'll let you.  So that's one reason they didn't

8    take that approach.

9             Secondly, I note the nominating paper at the top has

02:21 10   "Libertarian" under it, not "political party," because they're

11   a political designation.  But right at the top, "Libertarian,"

12   and then these electors.  Not in big print do we see Phillies

13   and Bennett.  The Libertarian piece is kind of front and center

14   on the nominating papers.

15            The overall, point, your Honor, is that substitution

16   is a fact of life for these minor political parties.  In fact,

17   in the last three presidential elections here in Massachusetts,

18   it was something that the Secretary had to wrestle with.  In

19   1996, that was -- the U.S. Taxpayer Party approached the

02:22 20   Secretary and said, We've got the issue.  And the Secretary

21   there said, We allow substitution.  We've allowed it in the

22   past, and we'll continue to allow it.  That, your Honor, we

23   included at Exhibit 5 of our preliminary injunction papers.

24            In fact, the Secretary said, We don't believe there's

25   a mechanism necessarily for substitution, but "to avoid an

1  interpretation of the election laws which burden the

2  constitutional rights of the minor political party candidates

3  for president, this office has permitted substitution before

4  and will continue to permit substitution," citing Anderson vs.

5  Firestone, where that was the exact holding.  For minor and

6  independent candidates, you have to allow substitution because

7  it is a fact of life.

8       In the 2000 presidential election, again, the

9  Secretary allowed it there with the Reform Party.  In 2004,

02:22 10  they, again, were ready to allow it.  Secretary Galvin was

11  quoted as saying that his office would "bend over backwards to

12  get candidates on and substitution should not be the problem."

13  That was for Ralph Nader, who did not get the 10,000 votes, so

14  it didn't really matter in the end, the point being that

15  substitution, again, is a fact of life in these minor-party

16  candidates.  It comes up in every election.  Again, here we

17  are.

18       I understand the Secretary says, well, you could have

19  just gone out and gotten 10,000 more signatures, but these are

02:23 20  not major political parties with $170 million to run their

21  campaigns.  They have tens of hundreds of thousands.  We do

22  have an affidavit evidence in our papers that the Libertarians

23  simply could not have afforded to go out and throw away those

24  7,000 signatures.

25       THE COURT:  They got 8,000 in less than two months.

1    Why couldn't they have gotten 10?

2           MR. BALTAY:  Your Honor, when they had the 7 in hand,

3    they had been promised they could substitute.  They're somewhat

4    familiar with the constitutional principles.  They had to make

5    a choice:  either drop the 7 and go for 7 more maybe, in which

6    case they're left with 7 and 7 or 7 and 8, neither of which

7    would have been enough.  So they had to go ahead.  They've

8    sworn that they didn't have the resources to start over, to

9    throw away those.  They needed 3 more at that point.  Not all

02:24 10    of them get qualified.  So they had 7.  They were 70 percent

11    there.  They just didn't have the resources.

12           So with this backdrop of substitution being a fact of

13    life, they approached the Secretary, through his attorney, and

14    said, We're going to have an issue here.  We're going to start

15    collecting in February of 2008.  We've got our convention

16    Memorial Day Weekend, National Libertarian Convention.  If the

17    candidate who we put on the original papers does not win the

18    party nomination, can we substitute?  And after a month or so

19    deliberation by the Secretary's attorney, the written response

02:25 20    came back.  And this is at Tab A of our preliminary injunction

21    papers.  The answer is yes.  "Our office can prepare a form

22    that allows the members of the party to request the

23    substitution for candidates.  If the situation comes up, please

24    contact our office and we will work with you."

25           The Secretary suggests this language doesn't mean yes.

1    It mean, yes, we'll work with you.  I read that, and I think a

2    fair reading is, yes, you can substitute, as they had said in

3    the prior three elections.  Yes, we realize substitution is a

4    fact of life, and we will allow it.

5         THE COURT:  You've got a heavy burden, don't you, to

6    prove to me that estoppel is going to apply to the Commonwealth

7    of Massachusetts on the basis of that email?

8         MR. BALTAY:  Well, your Honor, estoppel is our fourth

9    argument behind the constitutional arguments of twin vagueness

02:25 10   claims and then the constitutional claims.  Estoppel is a fair

11   argument.  It would allow the Court to sidestep the

12   constitutional issue.  Estoppel does lie against the

13   government.  It's a responsible government that we have.  When

14   they issue a written statement to a party that they know is

15   going to rely on it, I don't think it's unreasonable to hold

16   them to that.

17        Estoppel has been held up against the government on

18   many occasions.  I can cite some cases now for that.  The Best

19   vs. Gordon case from the First Circuit affirmed that; the

02:26 20   Seaboard Serdi (phon) case from Judge Mazzone of this court

21   affirmed that.

22        Estoppel is not our primary argument.  Our primary

23   argument, your Honor, is the void for vagueness challenge.  In

24   the Duke -- David Duke vs. Secretary of State of Rhode Island,

25   the court there, the United States District Court for the

1    District of Rhode Island, set forth, For a ballot election

2    scheme, it may be unconstitutionally vague if either a

3    reasonable person is left to guess at its meaning or if it

4    allows unreviewable discretion in the hands of that election

5    official.

6         We posit, your Honor, that both prongs are met here.

7    On the -- if left to guess at the meaning, that's exactly what

8    we have here.  There's an election scheme that says minor

9    parties must garner 10,000 votes.  That's Chapter 53 of the

02:27 10   Mass. General Laws, Section 6 and 7.  And that applies to --

11   Section 6 talks about state election, and Section 7, for the

12   same thing, talks about state office.  So I guess we are -- the

13   president is a state office.  Under the statute, you must get

14   10,000 signatures.

15        Section 13 of Chapter 53 says any candidate for town,

16   city, municipal or state office may withdraw by a date that's a

17   complicated calculation but August 26th or 29th.

18        The next section is Section 14.  It says any candidate

19   nominated for state office who withdraws may be substituted by

02:28 20   the same people that put him forth, or if a vacancy is caused

21   by withdrawal, a Certificate of Nomination made otherwise than

22   the original manner shall be filed within 72 hours.  That's, I

23   think, a September 3rd deadline.

24        So there's a statute that seems to me to say it

25   applies.  The Secretary says it doesn't.  The last time the

1    SJC, the State Supreme Judicial Court, looked at this general

2    scheme, one of the justices, Counihan, said it's -- the entire

3    Chapter 53 is somewhat impenetrable and vague and ambiguous, I

4    think he said.  So we've got the scheme.  It's not clear if it

5    applies.  We think it does.  The Secretary says it doesn't.

6         We're left with nothing, I think.  We don't know what

7    the policy is.  We've asked, What is the policy?  There is no

8    written policy on substitution for presidential candidates.

9    Maybe there's one that's passed down orally or something.  But

02:29 10   this is exactly the kind of scheme that leaves one guessing.

11   What's the policy?

12        At first, we were told you can substitute.  Now, it's,

13   no, you cannot.  Then we garner that it's maybe, well, you can,

14   only if you miss -- you have your convention after the deadline

15   for signatures.  Is that the policy?

16        So, here, we're just left guessing at the meaning of

17   the statutory and regulatory scheme, and we think it's void for

18   vagueness.  We're talking about substitution and ballot access.

19   It's pretty core constitutional issues.  And the scheme is --

02:29 20   we don't know what it is.  So the first prong of vagueness is

21   met, we assert.  We're left guessing.

22        Secondly, the Duke court -- that's the District of

23   Rhode Island court -- said a regime or statute may be

24   unconstitutionally vague if it allows the election official

25   unreviewable discretion.  In that case, the Secretary of State

1  of Rhode Island made -- the statute, I think, said, for a

2  primary, any candidate who's a bona fide candidate can be put

3  on.  So there, this issue was made that then President Bush was

4  obviously a bona fide candidate.  Patrick Buchanan was deemed a

5  bona fide candidate, but the former governor of Louisiana,

6  David Duke, was not.  And the court struck it down that it was

7  unconstitutionally vague because it's just too much discretion

8  for the election officials to decide who's bona fide and who's

9  not.  The result there, the court ordered that David Duke be

02:30 10  placed on.

11       Here, if the statute does not apply on its face -- if

12  it does, I think we should be allowed to substitute.  If it is

13  not, unreviewable discretion, your Honor, the Secretary allows

14  it or not, if it's Ralph Nader, they bend over backwards.  If

15  it's the Libertarians, at first, a year ago, sure, we'll allow

16  it; now, we won't.  There's no standard there to review.  So

17  that's -- the second prong is unreviewable.

18       We also have a further constitutional challenge -- I

19  might just back up on the statute.  This Court should, we hope,

02:31 20  and under all the laws, seek to see what the reasons stated by

21  the Commonwealth is for denying substitution.  As a balancing

22  test, we would assert strict scrutiny applies.  The

23  Commonwealth says something slightly less, a sliding scale

24  perhaps.

25       But there must be -- in focus in the inquiry must be

1    the state's proffered reason for not allowing substitution

2    which, again, we assert is a pretty important fundamental need

3    for minor political parties.  Looking at the statute first, the

4    Commonwealth says the statutory -- the statute, Section 14,

5    only applies to state officers.  I think this is what they say.

6    And the president is not a state officer.

7        I mean, if that's the case, then we've got a real

8    equal protection problem because any officer, senator or

9    congressman, governor, can substitute.  There's no problem.

02:32 10  There's no state interest that's at issue there.  But a

11    president cannot.  So that's problematic.

12        Also, the argument is that we don't need to, again,

13    talk about substitution because we could go out and get 10,000

14    more signatures.  But that's problematic, too, because there

15    the Secretary is saying you've gotten 10,000.  You need 10,000

16    more.  If you had scheduled your convention after the deadline,

17    then you would not need to go back and get 10,000 more.

18        So I wonder what the state interest is of, We don't

19    need the 10,000 if you schedule your convention later.  If you

02:33 20  schedule it earlier, there is some state interest.  And now the

21    Secretary is regulating when the party conventions are at the

22    national level.  That becomes problematic.

23        THE COURT:  You need to wrap up, Mr. Baltay, so I can

24    hear from the defendants.

25        MR. BALTAY:  Yes.  Thank you, your Honor.

1          On the equal protection claim, the Secretary has

2     pretty much admitted in the past there's a problem there.

3     That, again, is Exhibit 5 of our brief.  That was the 1996

4     letter where the Secretary wrote, We don't think Section 14

5     applies, but we realize then there's a problem.  And they said,

6     To avoid an interpretation of the election laws which burdens

7     constitutional rights of the minor party candidates, we have

8     and will continue to allow substitution.  So it's almost an

9     admission by the Secretary that there is that problem.

02:34 10          Voter confusion, to the extent they cite voter

11    confusion, they're going to have the wrong candidate on the

12    ballot.  We posit that is voter confusion.  To avoid voter

13    confusion, get the right people on the ballot.

14          Frivolous candidacies, they may say, is the reason

15    they may require us to do this.  In their own papers, they cite

16    that Bob Barr may come up with 6 percent of the vote.  His

17    party got 10,000 signatures.  That could hardly be a reason.

18          In summary, your Honor, we think the standards are met

19    for preliminary injunction.  We think we readily meet the

02:34 20    substantial likelihood of success on the merits.  Irreparable

21    harm, if the injunction is denied, the candidates will not be

22    on the ballot.  The citizens will not be able to vote.

23          Hardship, that falls in our favor, too.  The ballots

24    have not been printed.

25          And public interest may weigh in favor --

1          Your Honor, I'd note that the Secretary has informed

2     us that September 29th is the date by which they must

3     absolutely know the names of the candidates.  So on September

4     29th, either George Phillies and Chris Bennett will be listed

5     on the national ballot in November or, we are hopeful, your

6     Honor, that a favorable ruling would come down by then granting

7     the relief we ask for.

8          THE COURT:  Thank you, Mr. Baltay.  Who will be

9     arguing on -- Miss Goldman.

02:35 10          MS. SPECTOR:  I will.  Amy Spector, your Honor.

11          THE COURT:  Okay.

12          MS. SPECTOR:  In this case there is a constitutional

13     route to the ballot for nonparty candidates like Mr. Barr,

14     which is Section 6 of the statute.  The plaintiffs' entire

15     argument rests on an incorrect premise, which is, namely, that

16     the Libertarian Party should be treated in the same manner as a

17     recognized party.

18          But that's not the case.  The Libertarian Party is not

19     recognized as a political party in Massachusetts.  For a

02:35 20     recognized party, like the Democratic Party, the nominee chosen

21     at the party's national convention is automatically accorded a

22     place on the ballot.

23          That's not the case for a party like the "Libertarian"

24     Party.  It's not a recognized party.  Therefore, a nonparty

25     candidate who wants to get on the ballot has to follow the

1    procedures set forth in the statute, which is to get the 10,000

2    signatures.

3         So although Mr. Barr is free to designate himself as a

4    Libertarian -- and, by the way, so could any number of

5    candidates, including Mr. Phillies.  In fact, this is the case

6    we've seen from information from the New Hampshire Secretary of

7    State's website, that both of their names will appear on the

8    ballot in New Hampshire.  While Mr. Barr can choose --

9         THE COURT:  You mean on separate lines?

02:36 10         MS. SPECTOR:  Separate lines, yes.  While he can

11   choose to designate himself as a Libertarian or, for that

12   matter, as anything else, other than one of the recognized

13   parties, if he does so, in order to get on the ballot, he has

14   to meet the very simple requirement that he obtain 10,000

15   signatures.  Here, he hasn't obtained even one single signature

16   from a Massachusetts voter, much less 10,000.

17        As your Honor correctly noted, the plaintiffs were

18   able to collect 8,000 signatures for Mr. Phillies even after

19   learning that the substitution wasn't allowed, which

02:37 20   underscores the minimum burden involved and, also,

21   underscores -- your Honor also made the point that's at the

22   heart of our argument, which is, why should signatures in favor

23   of one candidate be appropriated and used for another

24   candidate?

25        The substitution of Mr. Barr's name would undermine

1    the whole purpose of a statute, which is that the candidate --

2    a nonparty candidate demonstrate a measurable community support

3    by obtaining signatures.

4            THE COURT:  What is the Commonwealth's procedure for

5    substitution of presidential candidates?

6            MS. SPECTOR:  Well, the --

7            THE COURT:  What if a candidate dies after nomination

8    and before the election and before the ballots are printed?

9            MS. SPECTOR:  Your Honor, there may well be a gap in

02:38 10    the state law.  I don't -- the Secretary hasn't confronted that

11    issue and it's not presented here.

12            The substitution provision that is in the statute,

13    which we think is not applicable here, which doesn't apply to

14    the presidential candidates, the spirit of that provision

15    suggests that you go back and get the nomination in the same

16    way that the original nomination was got.

17            THE COURT:  So it's the Commonwealth's position that

18    there is no substitution procedure with respect to presidential

19    elections as opposed to other elections?

02:38 20            MS. SPECTOR:  Well, I think they haven't confronted

21    the situation, the hypothetical that your Honor mentions.  In

22    any event --

23            THE COURT:  It's not so hypothetical.

24            MS. SPECTOR:  Well, if the -- first of all, the

25    candidate here is actually the elector, not the president.  So

1    if the statute applies at all, it applies to the electors who

2    may be state officers.  So if it applies, it would apply to the

3    electors.  So you would have to -- you would have to then get a

4    slate of new electors who would have to -- the statute provides

5    that you would have to have them -- any vacancy would have to

6    be filled in the same manner as the original nomination.

7         THE COURT:  That brings an interesting question to

8    mind, Miss Spector.  These petitioners actually signed a

9    petition with respect to the electors, did they not?

02:39 10        MS. SPECTOR:  Well, yes, they signed --

11        THE COURT:  Those electors are as viable today with

12   Barr at the top as they were with Phillies at the top, weren't

13   they?

14        MS. SPECTOR:  They signed a petition that indicated on

15   the top the name of Phillies and then on which the electors --

16   the 12 electors also have to signify their acceptance of their

17   nomination as electors, thereby signifying their pledge to vote

18   for the presidential candidate listed at the top of the paper.

19        THE COURT:  What if Mr. Phillies and Mr. Bennett say

02:40 20  we hereby withdraw and don't want to be the Libertarian Party

21   nominees, but we want to designate Mr. Barr and Mr. Root as

22   your substitutes, and the electors choose to adopt that

23   adoption?  The petitions that have been submitted to the

24   various towns, or wherever they have to submit the petitions,

25   are on behalf of the electors, are they not?

1          MS. SPECTOR:  Well, the voters signing those

2    petitions -- I mean, in some respects it's a technicality and

3    in some respects it's not.  It is the electors whom voters

4    actually technically choose.  But the --

5          THE COURT:  And that's who the people who signed this

6    petition were looking at.  They were looking at 12 names of

7    electors.

8          MS. SPECTOR:  Excuse me.  I didn't mean to interrupt

9    your Honor.

02:41 10          THE COURT:  No.  Go ahead.

11          MS. SPECTOR:  That's true.  They were signing their

12   names underneath the names of 12 electors.  But they don't --

13   in practicality, the voters don't care who the 12 electors are.

14   They care who -- which presidential candidate those electors

15   are pledged to vote for.

16          If the -- I mean, there's a reason that the

17   presidential candidates are listed on that form.  I mean, it's

18   because the voters, by signing the petition, are signifying

19   their support of the presidential candidate, albeit through the

02:41 20   mechanism that's provided under the Constitution through the

21   electoral college.  It's actually the actual vote cast on the

22   ballot.

23          THE COURT:  Aren't electors free to vote for someone

24   other than who was originally designated especially if the ones

25   who were designated say we withdraw and want you to cast your

1    electoral vote for Candidates Barr and Root?

2         MS. SPECTOR:  Well, I don't know what the parameters

3    are legally of the electors.  I believe that they have pledged

4    to vote for the candidate under which they are named.  But, in

5    any event, it would completely evade the requirements of the

6    law for nonparty candidates in the electors were simply allowed

7    to be substituted here.  All the 10,000 --

8         THE COURT:  The electors aren't asking to be

9    substituted.  They're asking to substitute the two for whom

02:42 10   they're going to vote.

11         MS. SPECTOR:  Yes.  Well, the plaintiffs have varied a

12   bit in their description of whether they're seeking the

13   substitution of the presidential name.  Today it was suggested

14   to me by plaintiffs' counsel that they might be seeking the

15   substitution of 12 new electors.  We received information that,

16   in fact, one of the electors -- we didn't put this in our

17   papers.  We only just learned of it yesterday -- but that one

18   of Mr. Phillies' electors, in fact, does not support the

19   candidacy of Bob Barr.  We thought that this information would

02:43 20   be received by the Secretary.  It hasn't yet.  Mr. Baltay

21   informed me this morning that he had, in fact, heard from this

22   elector.

23         Our position, though, is that whether or not those

24   electors would come in and support Barr is really irrelevant

25   because here, for example, they haven't shown that they do

1    support substitution, and, in fact, we have an indication that

2    one of them explicitly opposes it, but in addition to which, it

3    would just completely eviscerate the requirement that the

4    candidate, presidential candidate, go out and obtain -- that

5    there be support for the candidate.  That would be completely

6    undermined by allowing substitution here.

7          In fact, this is what happened recently with Mr.

8    Nader.  He discovered -- this is in our papers.  He discovered

9    that one of his electors was not qualified, did not meet one of

02:44 10   the qualifications, asked about substitution of different

11   electors and was informed by the Secretary that they would have

12   to go out and get additional signatures, which they did, for a

13   slate of 12 new electors.

14         I'm not going to touch very long on the standard of

15   review.  I think it's fairly clear under the Supreme Court's

16   more recent analysis that the court has adopted somewhat of a

17   sliding-scale approach where the court first focuses on the

18   extent of the burden.  In this case, the restrictions clearly

19   do not impose a severe burden.  The number of signatures is

02:44 20   less than the Supreme Court has upheld in several of the cases,

21   Jenness and White.  The First Circuit decision in the Diamond

22   case also indicates that numerical requirements of this sort

23   are clearly --

24         THE COURT:  Does time play a role in this, the fact

25   that it was under two months that they had to gather the

1    corrected signatures?  Does that have an impact on hardship?

2         MS. SPECTOR:  The time is relevant but, here, there

3    clearly was sufficient amount of time remaining.  The court has

4    upheld a shorter amount of time.  In the Storer case, the court

5    indicated that gathering, I think it was, 325,000 signatures in

6    24 days would suffice -- would be valid.

7         So I think there's a serious question here about the

8    extent of the burden.  Also, on that point, though, other

9    candidates have met the requirement, including Charles Baldwin

02:45 10    this year, who's running as a Constitution Party candidate.

11   This was a factor that the Supreme Court noted in a number of

12   its cases, including White and Jenness, certainly not

13   dispositive, but the fact that other candidates have been able

14   to meet the requirements is certainly an indication that it's

15   not unduly burdensome.

16        In terms of the -- just on the standard of review, I

17   would just point out that the Perez case, which the plaintiffs

18   rely on in support of their argument that a strict scrutiny

19   applies, that case is completely distinguishable.  In there,

02:46 20   the court found a severe burden because the signature gatherers

21   were essentially required to take every voter to a notary's

22   office -- this was in Puerto Rico -- or to bring a notary

23   around with them.  So it was a completely distinguishable case.

24        With respect to the vagueness claim, your Honor, our

25   view is that because Section 6 provides a constitutionally

1    valid route to get on the ballot, this Court does not need to

2    consider the plaintiffs' claim that another section of the

3    statute, Section 14, is vague.  To begin with, Section 14 is

4    really not meant as a ballot access provision in the first

5    place.  It's not meant as an alternative to getting on the

6    ballot.  It's really more an emergency.  It deals with sort of

7    an unusual situation, which is not presented here, like if a

8    candidate dies.

9         Here, in contrast, the plaintiffs were informed about

02:47 10   two months before the deadline that they had to go get the

11    signatures, and they chose -- for tactical or other reasons,

12    they chose not to comply but instead to let the deadline pass

13    and then initiate litigation claiming that the statute is

14    vague.

15         Even if the Court were to accept the plaintiffs'

16    approach and view this Section 14 as sort of an alternative

17    mechanism to get on the ballot, in our view the Court still

18    doesn't need to reach the vagueness claim.  I direct the

19    Court's attention to a case -- we didn't cite it in our memo,

02:47 20   but I have it today.  It's LaRouche vs. Kezer.  It's a Second

21    Circuit case reported at 990 F.2d 36.  That provides authority

22    on this exact point, which is, that where there's a

23    constitutionally valid route to the ballot, the court does not

24    have to entertain a vagueness challenge to another provision

25    that provides ballot access.

1          In that case, it involved a Connecticut statute which

2     had a signature requirement and then also had a requirement --

3     provision under which a candidate that was recognized by the

4     national media as a serious candidate could get on the ballot.

5     And the candidates there, Lyndon LaRouche and Eugene McCarthy,

6     just decided, like here, not to get any signatures at all.

7     They didn't even make any attempt.  Instead, they challenged on

8     vagueness grounds this other provision that would allow the

9     Secretary to put on the ballot a nationally recognized

02:48 10    candidate.

11          The district court found that the signature

12    requirement was valid, but the other requirement -- the other

13    provision, I'm sorry, was vague.  And the Second Circuit took a

14    different tact and found, well, since the signature requirement

15    was valid, whether or not the other provision is vague, it

16    really doesn't matter.  A fortiori, the other provision is

17    valid because it actually has the effect of providing an

18    expanded opportunity for ballot access.

19          For our purposes here, I think the Court -- the case

02:49 20    is very helpful because -- for the proposition that the Court

21    does not even need to entertain a vagueness challenge; whereas,

22    here, there's a constitutionally valid route to the ballot.

23    The plaintiffs, for whatever reason, chose not to follow it, to

24    let the deadline pass and then to claim afterwards that another

25    section of the statute is unconstitutionally vague.

1           THE COURT:  You need to wrap up as well, Miss Spector.

2           MS. SPECTOR:  I guess I would just reiterate the point

3    that, again, we don't feel that the Court need to or should

4    resolve the issue of that substitution provision, although, if

5    the Court is inclined to address that, we think that it would

6    only apply to the case of the electors themselves.  And if

7    there were -- if a vacancy in electors is to be filled, that

8    section provides that it has to be filled in the same manner as

9    the original nomination which, in other words, 10,000 new

02:50 10   signatures would have to be gathered.  Either way, you get to

11   the same result.

12          THE COURT:  Before you sit down, and following up just

13   a little bit on that elector question, is there a reason why

14   the electors listed on the Phillies-Bennett petitions could

15   not, if they were elected, decide in December to vote for Mr.

16   Barr and Mr. Root?

17          MS. SPECTOR:  In the case of the major parties, I

18   believe the statute explicitly provides that by -- that the

19   electors have actually made a pledge to vote --

02:51 20         THE COURT:  Do you have a cite for that statute?

21          MS. SPECTOR:  That's Chapter 53, Section 8.  I don't

22   think that the statute explicitly contains the same language in

23   the case of a nonparty candidate, although the nomination paper

24   itself, I think, could be read to indicate that the electors,

25   by signing their names, have signified their acceptance of

1    their nomination as electors and signify the pledge to vote for

2    the presidential candidate listed at the top of that paper.

3          THE COURT:  All right.  Thank you, Miss Spector.  I'll

4    give Mr. Baltay just a brief time to rebut if he wishes.

5          MR. BALTAY:  Yes, your Honor.  With respect to the

6    Court's inquiry on the Davoren case, we've addressed that at

7    Page 3 and 4 of our reply brief.

8          THE COURT:  Which case was that?  Davoren?

9          MR. BALTAY:  Yes, your Honor.  Excuse me.  Davoren.

02:52 10   We've addressed that at Page 3 and 4 of our reply brief.

11   There, there seemed to be no question as to what the statutory

12   scheme required.  The court did not want to wade into what the

13   state statute -- I guess it was clear what it said, and there

14   wasn't much for the court to do.

15          Here, the statutory scheme is completely vague.  The

16   policy that -- they said the statute does not apply and there's

17   a policy.  I would ask what it is.  I still don't know what

18   that is.  So there's a real vagueness problem here.  We're

19   dealing here with federal constitutional issues:  First

02:52 20   Amendment, free speech, free association, right to vote.

21   Ballot access is core federal constitutional issues for the

22   presidency of the United States.  So we think, certainly, this

23   Court can and should address the matter.

24          THE COURT:  Do you agree with the defendants that it

25   doesn't matter that this is a presidential election as opposed

1    to something else and that, in fact, the electors are the

2    individuals or -- is there any question in your mind that the

3    electors, rather than the candidates above their names, are the

4    ones for whom the signatures were gathered?

5         MR. BALTAY:  I view, your Honor, that the signatures

6    were gathered for the Libertarians.  That's right at the top.

7    The Libertarian Party went out and gathered these.  I see the

8    candidates and electors are there.  I hear what they're saying,

9    that the electors will vote for the candidates.  The populace

02:53 10   will vote for the candidate.  So it is a little confusing.  I

11   understand somewhat the electoral college.

12        THE COURT:  Does your argument about substitution have

13   any more weight because it's a presidential election and

14   involves the election of electors who are, in turn, going to

15   vote for presidential candidates than it would for any other

16   office, say, the United States Senator or Congressman?

17        MR. BALTAY:  I think it should be equally allowed in

18   all of those cases.  I agree the fact that there are electors

19   in the middle reduces any argument the state may have that

02:54 20   there's voter confusion, that the people at the supermarket --

21   I don't know who they thought they were signing for:  the

22   electors or the candidates or the Libertarian Party.  I think,

23   given that we do have the electors there lessens any arguable

24   state interest that there may be there to avoid --

25        THE COURT:  Is there any case law in support of that?

1          MR. BALTAY:  Not that I'm aware of, your Honor.  We

2    can certainly look for it.  If we find it, we will submit that

3    to you.

4          Your Honor, I challenge the Secretary to put forth

5    what compelling state interest or sliding scale, something

6    slightly less there is, for not allowing substitution in this

7    case.  And I still have not heard it after the able argument

8    was presented.  I just still have not heard that.

9          The upshot is that correct candidates will be denied a

02:54 10   place on the ballot.  What is the state interest?  We haven't

11   heard.  As far as I can tell, there is none.

12         Voter confusion, you're going to have the wrong

13   candidates on as a result of this.

14         Frivolous candidacies, we've got a guy who's going to

15   get enough votes, if they let him on, to qualify the

16   Libertarians as a political party going forward.  I disagree

17   that the Libertarians are not a political party.  We all

18   represent the Libertarian Party.  That's who is before the

19   Court today.

02:55 20         So those, your Honor, are my closing remarks.  Thank

21   you very much.

22         THE COURT:  Thank you, Mr. Baltay.  Miss Spector, do

23   you wish to have an equal rebuttal?

24         MS. SPECTOR:  I do.  I'll keep it short, your Honor.

25   Just to respond, first, to Mr. Baltay's last point, again, I

1    think the thrust of their argument is based on an erroneous

2    premise.  The Libertarian Party, whatever power and authority

3    it has, is not a recognized party in Massachusetts.  It's not

4    legally a recognized party.

5        The state interest is in ensuring that each candidate,

6    each nonparty candidate, have -- demonstrate a measurable

7    amount of support.  So any number of candidates, as I mentioned

8    at the outset, could designate themselves as Libertarian.  It's

9    -- the purpose of the law is to ensure that a nonparty

02:56 10   candidate, that individual, have obtained enough of support

11   among the community to earn a place on the ballot.

12       I want to try -- because I'm afraid I didn't answer

13   some of your Honor's questions --

14       THE COURT:  You have about a minute.

15       MS. SPECTOR:  Okay.  The cases where substitution was

16   allowed in the past was distinguishable.  And we certainly

17   would not argue that the Secretary has unfettered discretion.

18   The circumstance in 2000, which was the only one that the

19   plaintiff has cited in which substitution was actually

02:56 20   involved, it involved completely different circumstances where

21   the candidate was selected after the deadline for obtaining

22   signatures had passed so that at that point there was then no

23   available statutory mechanism to obtain ballot access.  That's

24   not the case here.  So that was a distinguishable situation.

25       The Anderson vs. Firestone case is also

1    distinguishable factually.  It also was not a premeditated

2    attempt to avoid going out and getting signatures.  That court

3    also didn't cite any authority for its conclusion.  No reported

4    cases cited the Anderson case.  And the court there appears to

5    have based its conclusion on a notion that is discredited,

6    which is the idea that major parties and nonparties have to be

7    treated exactly on same terms.  And with the benefit of

8    hindsight, we would say that the case simply not be given

9    credit.  Thank you.

02:57 10          THE COURT:  All right.  Thank you, Miss Spector.  Was

11    the plaintiffs' comment correct that the deadline for the

12    printing of ballots is September 29th?  Is that --

13          MS. SPECTOR:  That is correct, your Honor, yes.

14          THE COURT:  All right.  Thank you.  What I'm going to

15    do, counsel, is invite both sides, within three business days

16    -- and let's say by Wednesday -- the date of which escapes me

17    -- the 17th of September.  If counsel wishes to supplement, in

18    a memorandum of five pages or less, whether the right to

19    substitution is in any way affected by the fact that in this

02:58 20    case involving a presidential election as opposed to an

21    election for any lower office, that the designation of electors

22    in the petitions that are at issue has any bearing on the

23    necessity to accord substitution.

24          You can both file it.  I'm not going to have you do it

25    one after the other.  If you don't want to file anything,

1    that's fine.  But if you want me to consider anything in that

2    regard, it will be filed on or before 5 p.m. on Wednesday,

3    whatever that date was.  The 18th, did I say?

4         MR. BALTAY:  17th.

5         THE COURT:  Anything else, counsel?  If not, we're

6    adjourned.  Thank you.

7    (Whereupon, at 3:01 p.m. the hearing concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

4            I, Cheryl Dahlstrom, RMR, and Official Reporter of the

5    United States District Court, do hereby certify that the

6    foregoing transcript, from Page 1 to Page 34, constitutes, to

7    the best of my skill and ability, a true and accurate

8    transcription of my stenotype notes taken in the matter of

9    Civil Action No. 08-11340, Bob Barr and Wayne A. Root vs.

10   William F. Galvin.

11

12

13

14

15

16                        /s/ Cheryl Dahlstrom

17                        Cheryl Dahlstrom, RMR

18                        Official Court Reporter

19

20

21

22

23

24

25