UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOB BARR, et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>WILLIAM F. GALVIN, as he is SECRETARY OF THE COMMONWEALTH OF MASSACHUSETTS,<br><br>                              Defendant. | CIVIL ACTION<br>NO. 08-11340-NMG |

## MEMORANDUM OF LAW IN SUPPORT OF
## SECRETARY'S MOTION FOR SUMMARY JUDGMENT

In this action, filed in August 2008, plaintiffs Bob Barr ("Barr"), Wayne Root ("Root"), the "Libertarian Party of Massachusetts," and the Libertarian National Committee, sought declaratory and injunctive relief requiring the defendant Secretary of the Commonwealth ("Secretary") to place the names of Barr and Root as candidates for President and Vice President on the statewide ballot in November 2008.  At all relevant times hereto, there was no Libertarian "party" recognized under Massachusetts law but only a "political designation," as will be explained infra.  Massachusetts election law requires that, in order to appear on the ballot as candidates for President and Vice President, non-party candidates (i.e., persons who are not enrolled in one of the legally recognized "political parties" in Massachusetts) must gather and file 10,000 voter signatures in support of their candidacies.  Mass. G.L. c. 53, § 6.  The Supreme Court has recognized that signature requirements of this sort, which ensure that candidates appearing on the ballot demonstrate measurable community support, serve the state's "vital interests" in avoiding voter confusion, deception, and frustration of the democratic process. American Party of Texas v. White, 415 U.S. 767, 782 & n.14 (1974).

Prior to the November 2008 election, the "Libertarian Party of Massachusetts," having failed to garner the amount of public support set forth in Massachusetts law, did not qualify as a "political party" in the Commonwealth.  Accordingly, Barr and Root, who were selected as "Libertarian" nominees at a national convention on May 25, 2008, were required to obtain 10,000 voter signatures and submit those signatures to local election officials by the filing deadline, July 29, 2008, in order to have their names placed on the ballot in November. Although plaintiffs had ample time to collect and submit signatures on behalf of Barr and Root – at least 65 days, and potentially up to five months – they failed to do so.

Instead, plaintiffs initiated this litigation seeking to force the Secretary to "substitute" Barr's and Root's names for those of George Phillies and Chris Bennett, two other non-party candidates who had gathered and filed over 10,000 signatures.  Plaintiffs took this tack notwithstanding the straightforward requirements of Mass. G.L. c. 53, § 6, and that the Secretary advised them, almost two months before the July 29 signature deadline, that state election law does not provide for "substitution" of presidential candidates in these circumstances and thus that they were required to obtain 10,000 signatures to place Barr and Root on the ballot.

Following a hearing in September 2008, the Court, faced with a claim for ballot access on the eve of a national presidential election, granted plaintiffs' motion for a preliminary injunction, finding that plaintiffs would suffer irreparable harm absent injunctive relief.  As a result of the Court's ruling, Barr and Root (but not Phillies and Bennett) appeared on the November 2008 ballot in Massachusetts as the "Libertarian Party" candidates for President and Vice President.

The Secretary now respectfully moves for judgment in his favor, because there are no disputed material facts and because plaintiffs' claims – viewed without consideration of the equitable factors that shaped the Court's analysis in granting injunctive relief – are without merit as a matter of law.

## STATUTORY FRAMEWORK

Massachusetts recognizes, as a "political party," a political organization that either had h a candidate for statewide office who received at least 3% of the votes in the previous biennial state election or that enrolled at least 1% of the total number of registered voters in the commonwealth.  Mass. G.L. c. 50, § 1.  At the time of the November 2008 election, the Commonwealth recognized four political parties:  Democratic, Republican, Green-Rainbow, and Working Families.  Secretary's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Statement") ¶ 3.  The plaintiff "Libertarian Party of Massachusetts," which at the time of the November 2008 election was not a recognized "political party," is referred to as a "political designation," Mass. G.L. c. 50, § 1, or more informally, as a "non-party" or "minor party." Statement ¶ 3.

In order to have their names appear on the ballot, candidates for President and Vice President (such as Barr and Root) who are not enrolled in a recognized political party must file nomination papers signed by 10,000 registered voters.  Mass. G.L. c. 53, §§ 6-10.[1]  Any registered voter may sign a non-party candidate's nominating papers, and a voter may sign more than one candidate's petition.  Mass. G.L. c. 53, § 7.  In their nominating papers, non-party candidates may identify a "political designation" (such as "Libertarian Party").  The nomination papers actually nominate candidates for presidential electors, not candidates for President and Vice President, and therefore also must set forth the names and addresses of 12 electors, whose

---

[1] In order to have presidential candidates of a recognized "political party" placed on the ballot, the state committee of such party is required to submit to the Secretary, by the second Tuesday in September, a form identifying the presidential electors selected by the committee.  Mass. G.L. c. 53, § 8.  The form must contain the surnames of the candidates for President and Vice President, as well as the names and residences of the nominated electors.  Id.  The electors are required to sign their written acceptance on the form, thereby pledging to vote for the identified presidential candidates at the electoral college.  Id.

signatures accepting their nomination signify the electors' support for the presidential and vice presidential candidates identified on the papers. Mass. G.L. c. 53, § 8; Mass. G.L. c. 54, § 78 (candidates for electors are nominated to vote for specified presidential and vice presidential candidates).[2]  The 12 electors must be registered voters in Massachusetts. Mass. G.L. c. 53, § 9.

After gathering voter signatures, a non-party candidate is required to submit nomination papers to the election officials of the city or town in which each voter resides at least 28 days prior to the date for submitting the papers to the Secretary. Mass. G.L. c. 53, § 7. The local officials are required to certify whether the signatures are those of voters registered to vote in the city or town. Mass. G.L. c. 53, § 7. Following certification by the local officials, the nominating papers must be filed with the Secretary by the last Tuesday in August. Mass. G.L. c. 53, § 10. In 2008, the deadline for submission of papers to local officials was July 29; the deadline for submission to the Secretary was August 26. Mass. G.L. c. 53, §§ 7, 10; Statement ¶ 9.

## FACTUAL BACKGROUND

The undisputed material facts, set forth in greater detail in the Secretary's Statement, are briefly summarized here.

Barr and Root were nominated as candidates for President and Vice-President at a national "Libertarian Party" convention in Denver, Colorado, on May 25, 2008, and they accepted the nominations. Statement ¶ 12. At that time, the "Libertarian Party" of

---

[2]  The 12 electors must file a certificate of voter registration with the Secretary. Mass. G.L. c. 53, § 9. It is the electors who actually elect the President and Vice President. U.S. Const. art. II, § I, cl. 2; U.S. Const. Amend. XII. Therefore, although the general election ballot contains the names of the presidential and vice presidential candidates (and not the names of the electors), voters are actually voting to select "Electors of President and Vice President." Mass. G.L. c. 54, § 3; Statement ¶ 1. Although the language in Mass. G.L. c. 53, § 8, referring to the electors' "pledge," is not applicable to non-party candidates for elector, Mass. G.L. c. 54, § 78, reflects that all presidential electors (including non-party candidates for elector) are nominated to vote for the specified presidential and vice presidential candidates whose names appear on the ballot.

Massachusetts was not a recognized political party in Massachusetts.  Statement ¶ 3.

Accordingly, Barr and Root were required to circulate nomination papers (identifying themselves

as presidential and vice presidential candidates and identifying the 12 electors) and to file the

nomination papers, reflecting 10,000 certified voter signatures, in order to be placed on the

November 2008 ballot in Massachusetts; if they so qualified, they could be designated on the

ballot as "Libertarian" candidates for President and Vice President.  Mass. G.L. c. 53, § 6.[3]

Shortly after the "Libertarian" convention in Denver, George Phillies, chair of the "Libertarian

Party of Massachusetts," contacted the Secretary's office on May 29, 2008, inquiring whether

Barr and Root could be "substituted" for Phillies and his running mate, Chris Bennett, whose

names appeared, with those of 12 electors, on nomination papers circulated earlier in 2008 in

support of their non-party candidacies for President and Vice President under the "Libertarian"

designation.  Statement ¶ 13.  Phillies and Bennett had competed against Barr and Root at the

national convention but had not been selected.  Statement ¶ 12.[4]  A newspaper  reported that

Phillies and Barr "diverge significantly" in their political views.  Statement ¶ 30.  By early June

---

[3] Barr and Root did not obtain the 3% of votes required in order to qualify the Libertarians as a
political party; however, one candidate designated as "Libertarian" in the 2008 election, Robert
J. Underwood, a candidate for United States Senator from Massachusetts, received over 3% of
the total votes for that office.  Statement ¶ 24.  As a result, the Libertarian Party currently is
recognized as a political party in Massachusetts.  Statement ¶ 24.  This fact does not change the
nature of the dispute before this Court.

[4] Phillies had previously contacted the Secretary's office, in September 2007, inquiring as to
whether, if a presidential candidate identified on nominating papers were not selected at the
"Libertarian Party" national convention the following May, 2008, the name of the nominee
selected at the convention could be "substituted" on the ballot in place of the candidate named on
the nominating papers.  Statement ¶¶ 4-5.  A staff attorney at the Secretary's Elections Division
had responded, in an email dated October 26, 2007, stating that, in the event the Libertarians,
following their convention, were to seek to "substitute" different candidates from those identified
on the nomination papers, "our Office can prepare a form that allows members of the party to
request the substitution of the candidate.  All of the electors who appear on the nomination
papers will need to complete the form."  (emphasis added).  Statement ¶ 6.

2008, Phillies and Bennett had gathered roughly 7,000 signatures.  Statement ¶ 11.

The Secretary's office responded on June 5, 2008, explaining that "substitution" was not authorized and that "the party has almost 2 months to obtain the requisite number of signatures and comply with the statutory requirements to obtain ballot access," and advising Phillies to obtain signatures for the convention-endorsed candidates, Barr and Root.  Statement ¶ 14.  In an e-mail to the Libertarian National Committee on June 13, 2009, the Secretary's office reiterated that "substitution" was not authorized and "there remains a statutory process to gain ballot access for candidates nominated at your national convention."  Statement ¶ 15.

Phillies nevertheless continued to circulate and gather signatures on Phillies/Bennett nomination papers in June and July 2008; he ultimately submitted nomination papers to the Secretary on August 13, 2008, reflecting certification of 15,675 voter signatures, thereby entitling Phillies and Bennett to appear on the November 2008 ballot.  Statement ¶ 16.  Barr and Root did not submit any nomination papers to the Secretary, nor did they provide any evidence to the Secretary that they gathered 10,000 voter signatures or identified 12 electors who supported their candidacies.  Statement ¶ 17.  Instead, they instituted this litigation on August 6, 2008, seeking a preliminary and permanent injunction "prohibiting [the Secretary] from refusing to permit the substitution sought by Plaintiffs"; a declaration that the Secretary's "refusal" to permit "substitution" was unconstitutional; and attorneys' fees.  Complaint ¶ 83.

Other non-party presidential candidates have satisfied the Massachusetts ballot access requirements, including the Nader campaign in 2008, which collected the required number of signatures in less than the 65 days that plaintiffs had to obtain signatures for Barr and Root.  Statement ¶¶ 18-23.  Petitioners for ballot initiatives, who had to obtain more signatures in a shorter time period (and had to obtain the signatures from multiple counties), also have met the requirements for ballot access.

6

**ARGUMENT**

I.      **The Case Is Not Moot, Because the Claims Are
        Capable of Repetition Yet Evading Review.**

Although the November 2008 election is over, the claims presented in the Complaint,

concerning the validity of the signature requirement and the Secretary's determination that

"substitution" is not available in these circumstances, are "capable of repetition yet evading

review."  The case accordingly is not moot.  See Storer v. Brown, 415 U.S. 724, 737 n.8 (1974)

(reviewing decision upholding ballot access provision for independent candidates and holding

that "[t]he 1972 election is long over, and no effective relief can be provided to the candidates or

voters, but this case is not moot, since the issues properly presented, and their effects on

independent candidates, will persist as the California statutes are applied in future elections.

This is, therefore, a case where the controversy is 'capable of repetition, yet evading review.'")

(internal citation omitted); Moore v. Ogilvie, 394 U.S. 814, 816 (1969) (similarly treating

challenge to ballot access provision as capable of repetition yet evading review).

The issues presented are likely to recur, as it reasonably can be anticipated that other non-

party candidates will seek ballot access in Massachusetts in future elections.  These very same

plaintiffs indeed could present the identical issue in the next presidential election, in the event

that the Libertarian Party fails to retain its new status (see supra n. 3) as a recognized political

party at the biennial election in 2010.  See Libertarian Party of Maine v. Diamond, 992 F.2d 365,

369 n.5 (1st Cir. 1993) (appeal from dismissal of action challenging constitutionality of Maine

ballot access provisions was not moot, in part because "[s]o long as the challenged statutory

scheme remains in effect," the "possibility exists" that "the [plaintiff] Party and other small

parties" would be affected by the challenged signature requirements in the future), cert. denied,

510 U.S. 917 (1993).[5]

## II.   The Signature Requirement Is Consistent With
   The First and Fourteenth Amendments.

States are empowered to regulate elections, e.g., U.S. Const. art. II, § 1, cl. 2 (authorizing states to decide manner of selecting presidential electors), and the Supreme Court has long recognized that "as a practical matter, there must be a substantial regulation of elections [by the States] if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." Storer, 415 U.S. at 730.  "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997).

States must, of course, exercise this broad regulatory authority within the limits imposed by the Constitution. Williams v. Rhodes, 393 U.S. 23, 29 (1968); Cool Moose Party v. Rhode Island, 183 F.3d 80, 82 n.2 (1st Cir. 1999).  State limitations on access to the ballot by unaffiliated candidates and minor parties implicate "the rights of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Williams, 393 U.S. at 30.  Balancing the rights of voters and parties against the interests of the State in maintaining the integrity of elections has led the Supreme Court to devise "something of a sliding scale approach" to assessing ballot access restrictions. McClure v. Galvin, 386 F.3d 36, 41 (1st Cir. 2004) (citing Timmons, 520 U.S. at 359).  Restrictions imposing "severe burdens" on plaintiffs' rights must be "narrowly

---

[5]  In finding that an election case is "capable of repetition yet evading review," the Court has not required a showing that a particular plaintiff candidate is likely to run for office again.  See Anderson v. Celebrezze, 460 U.S. 780, 784 n.3 (1983) (on review of challenge to ballot access provision, the Court held that "although the 1980 election is over, the case is not moot" and did not inquire into whether plaintiff John Anderson himself would run for president again); Lawrence v. Blackwell, 430 F.3d 368, 372 (6th Cir. 2005), cert. denied, 547 U.S. 1178 (2006).

tailored and advance a compelling state interest."  Timmons, 520 U.S. at 358.   In contrast, "[l]esser burdens" trigger "less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'"  Id.  Because Mass. G.L. c. 53, § 6, imposes a relatively small burden on plaintiffs' voting and associational rights, it is subject to a less exacting review, under which it easily passes constitutional muster.

### A.   The Signature Requirement Poses Only a Minimal Burden on Plaintiffs and Therefore Is Not Subject to Strict Scrutiny.

The Supreme Court has made clear that restrictions of the kind imposed by Mass. G.L. c. 53, § 6, do not represent "severe burdens" on the First or Fourteenth Amendment rights of voters and parties.  The Court has upheld, for example, a state law requiring an independent candidate to get signatures representing 5% of the registered voters at the last general election for the office in question within six months, and file them in June before the November general election. Jenness v. Fortson, 403 U.S. 431, 433-34, 440 (1971).  The Court also approved a state law requiring independent candidates to gather, within 55 days, notarized signatures representing 1% of the total vote cast for governor in the previous election (at the time, approximately 22,000 signatures) from voters who have not voted in any other party's primary, and file them 120 days before the general election.  White, 415 U.S. at 777-78, 783-84, 786-87 & n.18.  And the Court has stated in dictum that a statute requiring an independent candidate to gather 325,000 signatures in 24 days does not, without more, impermissibly burden the constitutional rights of the candidate, the voters, or the party.  Storer, 415 U.S. at 738-40.

In comparison to the provisions upheld by the Supreme Court, the burden imposed by Mass. G.L. c. 53, § 6, is small.  The statute requires plaintiffs to gather 10,000 signatures from "voters," without regard to political affiliation or whether those voters have participated in a previous primary; moreover, there is no requirement that signatures be obtained from voters in

different geographical areas, and voters can sign multiple petitions in support of different candidates.  Mass. G.L. c. 53, § 6; compare, e.g., White, 415 U.S. at 785-788 (approving Texas provision requiring approximately 22,000 signatures of voters who had not participated in any other primary).  As a percentage of the 2,243,835 voters who voted in the 2006 statewide election (the most recent statewide election before the 2008 election), 10,000 signatures represents only 0.45%; as a percentage of the 2,927,455 voters who voted in the 2004 statewide election, 10,000 signatures represents only 0.34%.  Statement ¶¶ 25-26.  This is not a significant burden on plaintiffs' constitutional rights.  Jenness, 403 U.S. at 433-34, 440; White, 415 U.S. at 777-78, 783-84, 786-87; see also Diamond, 992 F.2d at 373.

Once nomination papers became available in early February, a non-party candidate had until late July to gather the 10,000 signatures.  Statement ¶¶ 7, 9.  In this case, Barr supporters could have utilized this entire 5-month period to circulate his petitions.  Even if plaintiffs waited to gather signatures until after the Libertarian convention in late May 2008, they had 65 days left to obtain those signatures.[6]  Substantially shorter periods of time have been upheld because they do not burden significantly the constitutional rights of voters, candidates, or parties.  White, 415 U.S. at 785-788 (55 days in which to gather 22,000 signatures ruled permissible); Storer, 415 U.S. at 740 (24 days in which to gather 325,000 signatures, without more, not impermissible) (dictum).[7]

---

[6]  Even measured from the date on which the Secretary informed Phillies in writing that "substitution" was not authorized, i.e., June 5, 2008, the plaintiffs still had 54 days in which to gather signatures, a time period that was not unduly burdensome.

[7] A deadline to file signatures 120 days in advance of the election is a reasonable restriction on voting and associational rights, as "some cut off period is necessary for the Secretary of State to verify the validity of signatures on the petitions, to print the ballots, and, if necessary, to litigate any challenges."  White, 415 U.S. at 787 n.18.  Accordingly, the Massachusetts deadline, which falls only approximately 98 days before the election, is constitutionally permissible.

### B.     The Signature Requirement Directly Serves the State's Important Interest in Safeguarding the Integrity of Elections.

"Substantial support" requirements, such as those in Mass. G.L. c. 53, § 6, are "meant to safeguard the integrity of elections by avoiding overloaded ballots and frivolous candidacies, which diminish victory margins, contribute to the cost of conducting elections, confuse and frustrate voters, increase the need for burdensome runoffs, and may ultimately discourage voter participation in the electoral process." Diamond, 992 F.2d at 371 (collecting cases). The Supreme Court has characterized these interests as "of the highest order" and of "fundamental importance," Lubin v. Panish, 415 U.S. 709, 715 (1974), as "vital" and "compelling," White, 415 U.S. at 782 & n.14, as "undoubted," Munro v. Socialist Workers Party, 479 U.S. 189, 194 (1986), and as duties of the State, Bullock v. Carter, 405 U.S. 134, 145 (1972).

The signature requirements in section 6 plainly survive the "less exacting review" applied to restrictions of general applicability that do not impose severe burdens on constitutional rights, as is the case here. Timmons, 520 U.S. at 358 (a state's "important regulatory interests" are generally enough to justify reasonable, non-discriminatory restrictions); Burdick v. Takushi, 504 U.S. 428, 440 n.10 (1992) ("limiting the choice of candidates to those who have complied with state election law requirements is the prototypical example of a regulation that, while it affects the right to vote, is eminently reasonable").

Moreover, the 10,000 signature requirement is reasonably related to the accomplishment of the State's objectives. That is all that is required under the less searching standard of review implicated here. Timmons, 520 U.S. at 358. The Supreme Court has repeatedly affirmed the use of signature requirements as a reasonable means of accomplishing these State objectives. E.g., White, 415 U.S. at 782-83; Storer, 415 U.S. at 738-40; Jenness, 403 U.S. at 442.

The "substitution" sought by Barr and Root circumvents the requirement that they

demonstrate a measure of community support as a condition of ballot access, and it undermines

the integrity of the signature process by allowing Barr and Root to "appropriate" the signatures

of voters who signed nominating papers in support only of Phillies and Bennett.[8]  Moreover, in

addition to having failed to obtain any voter signatures (much less the required 10,000), Barr and

Root did not obtain the signatures of 12 electors.  The 12 elector candidates for Phillies and

Bennett, having accepted their nomination as electors, pledged, or at least indicated to

nomination paper signers their intent, to support Phillies and Bennett at the electoral college.

Plaintiffs made no showing that any of the 12 elector candidates switched their allegiance to Barr

and Root or approved, as of August 2008, the substitution of Barr's and Root's names on the

ballot.[9]

---

[8] It is reasonable to assume that some voters who signed nomination papers supporting electors for Phillies and Bennett would be surprised by, if not upset about, the use of their signatures to obtain "substitution" of Barr and Root on the ballot, particularly given the reported philosophical differences between Phillies and Barr.  Plaintiffs' argument that the voters who signed nominating papers for Phillies and Bennett were thereby signifying their support for ballot placement of the "Libertarian Party" generally, rather than for specific presidential and vice presidential candidates, ignores the constitutionally valid distinction in Massachusetts election law between recognized political parties, whose convention-selected nominee for president automatically appears on the ballot, and non-party candidates, who may appear on the ballot only by filing 10,000 voter signatures in support of their candidacy.  That the statute is intended to ensure demonstrable community support for placement on the ballot of a particular non-party candidate is underscored by the fact that, under state law, multiple non-party presidential candidates identifying themselves as "Libertarian" (or any other such designation) could have obtained access to the November 2008 ballot as long as each candidate individually had met the signature requirement.  This was in fact the case in New Hampshire, where both Barr/Root and Phillies/Bennett appeared on that state's November 2008 ballot as "Libertarian" candidates for president and vice president.  Statement ¶ 36.

[9] Plaintiffs' memorandum filed with the Court on September 17, 2008, included a "representation" by plaintiffs' counsel that "the twelve elector candidates named in the nomination papers either support the substitution or would, as part of the substitution, agree to withdraw and be replaced by a new elector supporting Barr and Root."  Plaintiffs' Response to Court's Request for Supplemental Memorandum of Law Regarding Presidential Electors ("Pltf. Supp. Mem."), at 3.  Plaintiffs, however, did not submit an affidavit or other evidence

### III.     The Signature Requirement Does Not Deprive Plaintiffs of Equal Protection of the Laws.

Plaintiffs also claim that the ballot access provision discriminates against the Libertarians vis-à-vis the major parties, in violation of plaintiffs' rights under the Equal Protection Clause. Cplt. ¶¶ 76-80.  This Court, entertaining a nearly-identical challenge to a previous version of Mass. G.L. c. 53, § 6, held that such an argument, "although perhaps not yet treated by the Supreme Court to a ritual burial, has been decapitated by Jenness . . . , and by . . . White . . . ." Socialist Workers Party v. Davoren, 378 F. Supp. 1245, 1249 (D. Mass. 1974).[10]

In making an Equal Protection claim, plaintiffs must "demonstrate in the first instance a discrimination against them of some substance.  Statutes create many classifications which do not deny equal protection; it is only invidious discrimination which offends the Constitution." White, 415 U.S. at 781 (emphasis added) (citations and internal quotations omitted).  That a statute treats non-parties or independent candidates or voters differently from recognized parties is not, by itself, unlawful.  "'There are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a

---

establishing that the 12 elector candidates in fact supported "substitution" or were willing to withdraw and, indeed, one of the 12 electors stated in a web posting that he did not support Barr's placement on the ballot.  Statement ¶¶ 33-34.  In any event, any factual dispute that plaintiffs might seek to create by presenting belated evidence of the electors' intent would not preclude summary judgment for the Secretary.  The absence of evidence that the electors had agreed to "substitution" provides an additional reason against "substitution," which would subvert state and federal law provisions recognizing the vital role of the presidential electors; but an affirmative showing that the electors in fact favored it would not warrant "substitution," which is neither constitutionally required nor statutorily authorized and would thwart the will of the over 10,000 voters who signed the electors' nomination papers listing Phillies and Bennett as the candidates supported by the electors.

[10] The previous version of the statute required the candidates to obtain a number of signatures equal to 2% of the entire vote cast in the most recent gubernatorial election if running for state-wide office, or 2% of the votes cast in the most recent gubernatorial election in the electoral district or division for which the candidate was seeking election.  See Davoren, 378 F. Supp. at 1247 (citing Mass. G.L. c. 53, § 6, as amended by St. 1973, c. 849).

new or small political organization on the other.  [A State is not] guilty of invidious discrimination in recognizing these differences, and providing different routes to the printed ballot.'"  Diamond, 992 F.2d at 375 (quoting Jenness, 403 U.S. at 441-42).

The Massachusetts ballot access scheme does just that: it offers certain privileges, but also imposes certain obligations, on established political parties.  As the Court observed in Davoren, political party status in Massachusetts is "not an unmixed blessing," as it entails substantial regulation from which non-party candidates, such as Barr and Root, are free.  378 F. Supp. at 1247.  Non-party presidential candidates are free from such regulation under state law but must demonstrate a requisite level of support before their names may be placed on the ballot. Mass. G.L. c. 53, § 6.  This distinction reflects the inherent differences between the major parties, on the one hand, and non-party candidates, on the other.  The mere fact that the statute provides different paths to the ballot for non-party and party candidates provides no basis for an equal protection claim.

Plaintiffs also claim that the Secretary violated their right to equal protection in relation to other non-parties, insofar as the Secretary denied plaintiffs' request for "substitution" of candidate names while having allowed "substitution" in previous elections, notably in the case of the Reform Party in 2000.  Cplt. ¶¶ 76-78.  This claim is without merit.  As the Elections Division explained in its letter of June 5, 2008, the Secretary in 2000 allowed the substitution of a "Reform Party" vice presidential candidate in the "unique set of circumstances" then presented, namely, that the nominating convention did not occur until August, after the late July deadline for submission of nominating papers to local election officials, with the result that "it was not possible for the Reform Party to obtain the requisite signatures for the new [vice-presidential]

14

candidate" in advance of the July deadline.  Statement ¶ 14.[11]  Thus "substitution," on the one

occasion cited by plaintiffs that this Secretary has allowed it, did not enable a candidate to avoid

compliance with a then- available statutory means of obtaining ballot access.[12]  Here, in contrast,

at the time that Barr and Root were selected as candidates at the "Libertarian Party" convention

in May, they had a readily available means to obtain ballot access – namely, to comply with the

signature requirement by gathering 10,000 signatures in roughly two months, a valid

requirement, as discussed supra.[13]  The Secretary's determination here to require adherence to a

constitutionally valid ballot access requirement can therefore hardly be characterized as

"invidious discrimination" or as "arbitrary."

### IV. Plaintiffs' Challenge to Mass. G.L. c. 53, § 14, on Vagueness Grounds, Need Not and Should Not Be Reached, Because a Constitutionally Valid Means to Obtaining Ballot Access is Provided in Mass. G.L. c. 53, § 6.

In their preliminary injunction papers, plaintiffs also challenged, on vagueness grounds,

Mass. G.L. c. 53, § 14, which provides that "[i]f a candidate nominated for state, city or town

---

[11] The fact that the candidate in question was one for vice president rather than president lessened the possibility of potential unfairness to voters who had signed nomination papers on behalf of the "Reform Party" candidate for president and original candidate for vice president, as the presidential candidate supported by those voters still remained on the ballot.

[12] Plaintiffs also point to the case of the U.S. Taxpayers Party in 1995 and the Nader campaign in 2004, but the Secretary in fact did not allow "substitution" in either case.  In 1995, the Secretary expressed a willingness to consider "substitution" in the case of the U.S. Taxpayers Party, whose convention did not occur until after the deadline for filing nominating papers, but it ultimately was not allowed.  Statement ¶ 28.  Plaintiffs also suggest, incorrectly, that the Secretary expressed his approval of "substitution" on the ballot of Peter Camejo as the running mate for non-party presidential candidate Ralph Nader in 2004, citing a statement by the Secretary quoted in the Boston Globe.  Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction ("Pltf. Mem.") at 11.  The Secretary's comment is inadmissible hearsay and taken out of context; in any event, the Secretary subsequently determined that "substitution" of Camejo's name would not be allowed.  Statement ¶ 29.

[13] Plaintiffs' claim regarding the "cost" of obtaining new signatures is particularly unpersuasive, insofar as plaintiffs are free to use volunteers to gather signatures, and nomination papers are available free of charge from the Secretary's office.

office dies before the day of election, or withdraws his name from nomination, or is found ineligible, the vacancy . . . may be filled by the same political party or persons who made the original nomination, and in the same manner . . . ."  Mass. G.L. c. 53, § 14.  In its injunction ruling, the Court held that "even without specifically determining whether the statute is void for vagueness," Mass. G.L. c. 53, § 14 "will likely fail constitutional scrutiny as applied to the plaintiffs under the McClure test," a reference to McClure v. Galvin, 386 F.3d at 41, where the First Circuit Court applied the Supreme Court's "sliding scale approach" in Timmons. Memorandum & Order, at 8.  The Court reasoned that an "ambiguity" as to "whether the substitution process set forth in § 14 applies to presidential nominees" likely imposed an unconstitutional burden on plaintiffs.  Memorandum & Order, at 7-8.

The Secretary respectfully submits that the Court's ruling was erroneous.  Because the signature requirement set forth in Mass. G.L. c. 53, § 6, provides a constitutionally valid means to obtain ballot access, it is of no moment that plaintiffs might assert that another provision of state law – concerning vacancies of candidates for state and local office and which they claim allows ballot access here – is unconstitutionally vague.  So long as there exists a valid route to the ballot that does not unconstitutionally burden plaintiffs, the possibility that an additional ballot access provision lacks precision does not burden plaintiffs' constitutional rights.  In LaRouche v. Kezer, 990 F.2d 36, 37-41 (2nd Cir. 1993), for example, the court held that, because a statutory provision authorizing ballot access to candidates who obtained signatures of 1% of party's registered voters provided a constitutional means to get on a state's presidential primary ballot, the district court erred in striking down, on vagueness grounds, an alternative provision that accorded ballot access to candidates based on their media recognition.  Similarly, the First Circuit declined to definitively resolve a challenge to a state ballot access provision where the state law also provided an alternative means of ballot access that was constitutional.

Diamond, 992 F.2d at 374-75 & n.12 (declining to consider, in isolation, a challenge to Maine's requirement that party candidates gather certain number of signatures or votes from party members within district, because candidates had alternative of using petition procedure that allowed them to run as independent candidates and gather signatures from voters of any political affiliation in district, which was not onerous).

Moreover, plaintiffs' vagueness claim rests on an erroneous premise:  that Mass. G.L. c. 53, § 14, authorizes "substitution" as an alternative means of obtaining ballot access in the first instance, without satisfying the ballot access provision in Mass. G.L. c. 53, § 6.  It is apparent on the face of section 14 that it is not intended to provide a means by which a candidate can plan in advance to obtain ballot access in place of another candidate, in lieu of complying with the signature requirements set forth in Mass. G.L. c. 53, § 6.  Rather, section 14 addresses the circumstances in which a candidate who has already satisfied certain conditions to obtaining ballot access becomes disqualified, as in the case of death, or ineligibility, or if a candidate withdraws unexpectedly after nomination papers are filed.[14]  There is no statutory authorization in Mass. G.L. c. 53, § 14 for the "substitution" sought by plaintiffs here.

In addition, Mass. G.L. c. 53, § 14, which is limited to vacancies in nominations of candidates for a "state, city or town office," cannot reasonably be understood to apply to candidates for President and Vice President, who are selected by a nationwide election at the electoral college and therefore are certainly not "state officers" within the meaning of section

---

[14] At least as recently as August 13, 2008, the date on which the Phillies/Bennett campaign filed their nomination papers with the Secretary, the electors for Phillies/Bennett had signified their acceptance of their nomination in support of Phillies and Bennett.  Statement ¶ 16; Mass. G.L. c. 53, § 9 (candidates must file written acceptance of the nomination along with nomination papers).

14.[15]  In any event, construing the statute to apply to presidential candidates would not authorize the placement of Barr's and Root's names on the ballot, as section 14 provides that a vacancy may be filled "by the same political party or persons who made the original nomination, and in the same manner" as the original nomination, language that would require new nomination papers, with 10,000 voter signatures, to be submitted on behalf of Barr and Root.

If section 14 has any application in the context of a presidential election, the only candidates to whom the vacancy provision conceivably could apply are the electors, who are the persons actually "chosen at [the] state election" and therefore are the only persons who could fall within the statutory definition of "state officer."  Mass. G.L. c. 50, § 1.[16]  Even if plaintiffs had attempted to transform their original request – for "substitution" of the names of Barr and Root on the ballot – into a request to "substitute" new presidential <u>electors</u> supporting Barr and Root – the statutory prerequisites for filling a vacancy were not met.  The statute only provides for filling of a vacancy in cases where a candidate dies before the day of election, withdraws, or is found ineligible; but none of the 12 electors who accepted nominations to support Phillies and Bennett died, withdrew, or was found ineligible.  The belated representation by counsel, in

---

[15] The Secretary respectfully submits that the Court erred in reasoning that, because Mass. G.L. c. 50, § 1, defines "state officers" to include "any person . . . chosen at a state election" and "state election" is defined as "any election at which a national, state or county officer . . . is to be chosen by voters" (defined as a "registered voter," which refers only to voters registered in Massachusetts), it is "ambiguous whether . . . §14 applies to presidential nominees." Memorandum & Order, at 7.  The statute's definition of "state election" is most reasonably read as applying only to those "national" offices selected by Massachusetts voters alone, namely, United States Senator and Representative; the inclusion of language in the definition of "state officer" specifically referring to United States Senator and Representative, and the absence of any mention of the President, further confirms that "state officer" does not include the President of the United States.

[16] Even assuming that Mass. G.L. c. 53, § 14, applies to presidential electors, the "office" in question in essence was "elector for Phillies and Bennett" (not merely "elector") so that the statute could hypothetically only authorize vacancies in the slate of Phillies/Bennett electors to be filled with a new slate of electors who <u>also</u> supported Phillies/Bennett.

plaintiffs' September 17 supplemental memorandum, that the 12 electors "would, as part of the substitution, agree to withdraw," Pltf. Supp. Mem., at 3, certainly did not constitute a valid withdrawal under the statute, which requires that a withdrawal be made "by a request signed and duly acknowledged by [the candidate] before a notary public."  Mass. G.L. c. 53, § 13. Moreover, by that time, the deadline for withdrawal had long passed.[17]  Beyond those obstacles, the statute in any event would not enable plaintiffs to dispense with the signature requirement in Mass. G.L. c. 53, § 6, because, as noted above, section 14 requires that any vacancy be filled "in the same manner" as the original nomination.[18]

Finally, to the extent that the vagueness claim at its core merely reflects plaintiffs' disagreement with the Secretary over the proper interpretation of state law, the Court should decline to reach it, since any claim in federal court challenging the Secretary's interpretation of state law as erroneous would be barred by the Eleventh Amendment.  Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 117 (1984).  This Court has previously had occasion to dispose of a similar vagueness claim.  Davoren, 378 F. Supp. at 1248-49 (declining to address

---

[17] The deadline to withdraw was August 29, 2008.  See Mass. G.L. c. 53, § 13 (candidate may withdraw his name from nomination by filing a signed request "within the time prescribed by section eleven for filing objections to certificates of nomination and nomination papers and no such requests for withdrawals shall be received after such time has expired."); id. § 11 (objections to nomination papers to be filed with Secretary in accordance with Mass. G.L. c. 55B); Mass. G.L. c. 55B, § 5, ¶ 1 (objections to nomination papers for state election to be filed with Secretary within 72 hours after deadline for filing nomination papers, which in 2008 was August 26, see Mass. G.L. c. 53, § 10, ¶ 1; Statement ¶ 9).

[18]  The statute further provides that "if the time is insufficient" for filling the vacancy "in the same manner" as the original nomination, then the vacancy may be filled, in the case of a nomination originally made by convention or caucus, "in such manner as the convention or caucus may have prescribed, or if no such provision has been made, by a regularly elected general or executive committee representing the political party or persons who held such convention or caucus."  In the case of presidential electors, who are nominated not by convention or caucus but instead are nominated by either nomination papers (in the case of non-party candidates, Mass. G.L. c. 53, § 6) or by party committee (in the case of recognized political parties, Mass. G.L. c. 53, § 8), the statute makes no provision for filling a vacancy in cases where there is "insufficient" time to do so in the "original manner."

minor party's claim that ballot provisions were unconstitutionally vague, where essence of claim was that state officials "simply told it to do what it characterizes as the wrong thing.").[19]

### V.      The Commonwealth Is Not Subject to Estoppel.

Plaintiffs also seek to avoid the requirements of the state's election laws based on the October 2007 e-mail by a staff attorney in the Secretary's Elections Division, responding to Phillies' inquiry regarding "substitution," and stating that "our Office can prepare a form that allows members of the party to request the substitution of the candidate." Cplt. Ex. A.  Plaintiff "Libertarian Party of Massachusetts" claims to have relied on that statement to its detriment, in that it expended efforts circulating a petition bearing Phillies' and Bennett's names.  Pltf. Mem. at 17-18.[20]

The Court correctly rejected plaintiffs' estoppel claim, recognizing that "estoppel against the government if it exists at all is hen's-teeth rare."  Costa v. INS, 233 F.3d 31, 38 (1st Cir. 2000); Memorandum, & Order, at 5.  "It is firmly settled that a party seeking to raise estoppel against [a] sovereign must, at the very least, demonstrate that government agents have been guilty of affirmative misconduct."  Dantran, Inc. v. United States Dep't of Labor, 171 F.3d 58, 67 (1st Cir. 1999) (collecting cases).  As this Court correctly found, "[n]o such showing has been made here."  Memorandum & Order, at 5.

The October 2007 e-mail "made no promise that the request for substitution would be

---

[19] In any event plaintiffs' vagueness claim, which is not even alleged in the Complaint but only raised in their preliminary injunction papers, would fail.  Plaintiffs' suggestion that the statute is imprecise does not rise to the level of constitutional concern under the due process clause.  See, e.g., United States v. Lachman, 387 F.3d 42, 56 (1st Cir. 2004) ("The mere fact that a statute or regulation requires interpretation does not render it unconstitutionally vague.").

[20] Plaintiffs also claim – but with no supporting evidence – to have relied on the Secretary's statements regarding substitution in the 2004, 2000, and 1996 elections but, as discussed above, those situations (in only one of which the Secretary actually allowed substitution, in 2000) were factually distinguishable.  Any "reliance" on those circumstances was misguided at best.

granted," Memorandum & Order, at 6, and the Secretary made abundantly clear, as early as the

June 5, 2008, letter from the Elections Division to Phillies, that substitution would not be

permitted.  Moreover, the signature requirement is clearly set forth in Mass. G.L. c. 53, § 6.

Plaintiffs therefore cannot justifiably have relied on any arguably contrary statement contained in

the October 2007 e-mail.  "[I]f a statute . . . clearly limns a party's legal obligations, the party

cannot justifiably rely for estoppel purposes on a government agent's representation that the law

provides to the contrary."  Dantran, Inc., 171 F.3d at 67 (internal citations omitted).

## CONCLUSION

        For the foregoing reasons, the Court should enter summary judgment declaring that the

Secretary's determination, not to allow the "substitution" sought by plaintiffs, was constitutional.

                                Respectfully submitted,

                                SECRETARY OF THE COMMONWEALTH
                                OF MASSACHUSETTS,

                                By his attorneys,

                                MARTHA COAKLEY
                                ATTORNEY GENERAL

                                /s/ Amy Spector
                                Amy Spector, BBO No. 557611
                                Timothy J. Casey, BBO No. 650913
                                Julie B. Goldman, BBO No. 648489
                                Assistant Attorneys General
                                Office of the Attorney General
                                One Ashburton Place
                                Boston, MA  02108
                                (617) 727-2200, ext. 2076
                                amy.spector@state.ma.us
March 31, 2009

### Certificate of Service

        I hereby certify that the above Memorandum was filed through the Electronic Case Filing
(ECF) system on March 31, 2009, and thus copies will be sent electronically to the registered
participants as identified on the Court's Notice of Electronic Filing (NEF); paper copies will be
served by first-class mail to those indicated on the NEF as non-registered participants.
                                /s/ Amy Spector
                                Amy Spector