```
                    United States District Court
                      District of Massachusetts
_____
                              )
BOB BARR, WAYNE A. ROOT,      )
LIBERTARIAN PARTY OF          )
MASSACHUSETTS, and LIBERTARIAN)
NATIONAL COMMITTEE, INC.,     )      Civil Action No.
        Plaintiffs,           )      08-11340-NMG
                              )
        v.                    )
                              )
WILLIAM F. GALVIN, as he is   )
SECRETARY OF THE COMMONWEALTH OF)
MASSACHUSETTS,                )
        Defendant.            )
_____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

In September, 2008, the Court entered a preliminary injunction ordering the defendant in this case, William F. Galvin ("Galvin"), in his capacity as the Secretary of the Commonwealth of Massachusetts, to place the names of Bob Barr ("Barr") and Wayne A. Root ("Root") as the Libertarian candidates for president and vice president, respectively, on the Massachusetts ballot for the 2008 presidential election. The parties have now filed cross-motions for summary judgment.

**I.   Background**

    **A.   Factual Background**

Because the Libertarian Party is not one of the recognized

"political parties" in the Commonwealth of Massachusetts, its candidates may appear on an election ballot only if it submits a valid nominating petition. Such a petition must designate 12 electors, be signed by at least 10,000 voters, and be submitted within sufficient time to permit Town Clerks to prepare for the election. M.G.L. c. 53, § 6. In 2008, the deadline for filing nominating petitions was July 29.

Beginning in late July, 2007, the plaintiffs, Barr, Root, the Libertarian Party of Massachusetts and the Libertarian National Committee, Inc., began preparing for the 2008 presidential election. The nominating convention for the Libertarian Party was not held until late May, 2008, however, thus forcing the plaintiffs to make a choice between waiting until after the convention and collecting all 10,000 signatures within two months or guessing who their nominees would be and circulating petitions for candidates who might not eventually be their party's nominees. The plaintiffs chose the latter course, gathering signatures in support of Dr. George Phillies ("Phillies"), who is the Chair of the Libertarian Party of Massachusetts, for president, and Chris Bennett ("Bennett") for vice president. They eventually collected over 15,000 signatures on the Phillies-Bennett petitions.

In July, 2007, Phillies inquired of the Elections Division of the Office of the Secretary of the Commonwealth ("the

Secretary") as to whether the Libertarian Party would be allowed to substitute the names of the nominees actually chosen at its convention, in the event that they were not Phillies and Bennett. The Secretary responded, via e-mail, through one of his attorneys, Kristen Green ("Attorney Green"), on October 26, 2007, that the Libertarian Party could "prepare a form that allows members of [that] party to request the substitution of the candidate." The plaintiffs understood the response as an assurance that a substitution would be allowed and proceeded accordingly.

　　Barr and Root ultimately defeated Phillies and Bennett and won the Libertarian Party's nomination. Immediately thereafter, on May 29, 2008, the plaintiffs reestablished contact with the Secretary and sought to substitute the nominees' names on the petitions they had gathered. On June 5, 2008, however, the Secretary informed the plaintiffs that no substitution would be permitted because he viewed Phillies and Bennett as having been mere "stand-ins" who were not actually seeking their party's nomination. By that time, the plaintiffs had collected approximately 7,000 signatures on behalf of Phillies and Bennett. They determined that it would be impossible for them to abandon those signatures and the resources that had been devoted to collecting them to start afresh. The plaintiffs chose, instead, to continue gathering signatures on the original petition and to

challenge in court the Secretary's refusal to allow substitution.

### B.    Procedural History

On August 6, 2008, the plaintiffs filed suit alleging that Galvin was in violation of 1) the First Amendment of the United States Constitution by impairing their rights to free speech, to cast their votes effectively and to develop a new political party and 2) the Equal Protection Clause of the Fourteenth Amendment of the Constitution by discriminating between a) major and minor political parties and b) parties that hold their nominating conventions before the deadline for submitting nomination petitions and those that hold their conventions after the deadline.  The plaintiffs sought declaratory judgment as well as injunctive relief to require Galvin to place the names of Barr and Root as the Libertarian candidates on the Massachusetts ballot for the 2008 presidential election.

On September 22, 2008, shortly before the Massachusetts presidential ballots were to be printed, the Court allowed the requested preliminary injunction ("the September, 2008, Order").[1] See Barr v. Galvin, 584 F. Supp. 2d 316, 322 (D. Mass. 2008). Galvin appealed that order but he later voluntarily dismissed the appeal.  On March 31, 2009, the parties filed cross-motions for

---

[1] Barr and Root obtained 13,189 votes (about 0.4% of all votes cast) in Massachusetts in the 2008 election.  See Fed. Election Comm'n, 2008 Official Presidential General Election Results 1 (Jan. 22, 2009), available at http://www.fec.gov/pubrec/fe2008/2008presgeresults.pdf.

summary judgment which were timely opposed and are currently pending before the Court.

## II. Legal Analysis

### A. Justiciability

The Court notes at the outset that both parties agree that this case is not moot despite the long-past occurrence of the 2008 presidential election because the controversy is "capable of repetition, yet evading review."  See Storer v. Brown, 415 U.S. 724, 737 n.8 (1974) (citation omitted).

### B. Legal Standard for Summary Judgment

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990).  The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When cross-motions are filed, the Court must apply that standard and determine which party, if either, deserves summary judgment.  Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

### C.  Application

#### 1.  Law of the Case Doctrine

As the Court explained in the September, 2008, Order, the constitutionality of state action affecting ballot access is reviewed using a sliding scale such that, to pass muster, voting regulations imposing "severe burdens" must be narrowly tailored to a "compelling state interest" but "reasonable, nondiscriminatory restrictions" must be justified by only "important regulatory interests." McClure v. Galvin, 386 F.3d 36, 41 (1st Cir. 2004), citing Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997); see Barr, 584 F. Supp. 2d at 320.  When it entered a preliminary injunction against Galvin, the Court determined that, for reasons described below, M.G.L. c. 53, § 14 was ambiguous with respect to whether it applied to presidential nominees and "[s]urely there can be no state interest that would justify" the burden imposed by such ambiguity.  Barr, 584 F. Supp. 2d at 320-21.

Barr argues that the Court should enter summary judgment purely on the basis of that ruling pursuant to the law of the case doctrine which provides that, once a court decides a rule of law in a case, its decisions in later stages of the case should comport with that rule.  See Naser Jewelers, Inc. v. City of Concord, 538 F.3d 17, 20 (1st Cir. 2008).  That doctrine is inapplicable here, however, because in its September, 2008,

Order, the Court ultimately ruled that § 14 was only "<u>likely</u> [to] fail constitutional scrutiny," <u>Barr</u>, 584 F. Supp. 2d at 321 (emphasis added), and, therefore, no absolute rule of law governs this case.  As the First Circuit Court of Appeals made clear in <u>Naser Jewelers</u>, an initial ruling that "was designed to be preliminary" constitutes an exception to the law of the case doctrine.  538 F.3d at 20; <u>c.f.</u> <u>id.</u> (applying the law of the case doctrine to decide a motion for summary judgment where the court had previously held that an ordinance was <u>unequivocally</u> constitutional when it denied a motion for a preliminary injunction).

        **2.    Constitutionality of Chapter 53, Section 14**

    Accordingly, the Court will re-consider the constitutionality of § 14.  That statute sets forth the procedure for filling the vacancy created when "<u>a candidate nominated for a state, city or town office</u> dies before the day of election, or withdraws his name from nomination, or is found ineligible." M.G.L. c. 53, § 14 (emphasis added).  Thus, on its face, § 14 does not appear to apply to candidates for the offices of President and Vice-President of the United States.

    Another statute, M.G.L. c. 50, § 1, however, defines the term "state officer" so as to render the term "state ... office" in § 14 applicable to presidential and vice-presidential nominees.  Chapter 50, § 1 mandates that "state officer"

> shall apply to, and include, any person to be nominated at a state primary or chosen at a <u>state election</u> and shall include United States senator and representative in Congress.

M.G.L. c. 50, § 1 (emphasis added). The same statute also defines "state election" as applying

> to any election at which a <u>national, state, or county officer</u> or a regional district school committee member elected district-wide is to be chosen by the voters.

<u>Id.</u> (emphasis added). As this Court previously concluded, under § 1,

> A "state officer" is, ultimately, defined as "a national, state or county officer." Thus, the category of "state officers" is defined to be broader than itself, a nonsensical conclusion.

<u>Barr</u>, 584 F. Supp. 2d at 320. Based upon the circular definitions set forth in § 1, the inclusion of the term "state ... office" in M.G.L. c. 53, § 14 leaves the determination of whether that statute is applicable to presidential and vice-presidential nominees positively ambiguous. <u>Id.</u>

Where, as here, the meaning of a statute is unclear, it may be found to be void for vagueness. <u>See</u> <u>Duke</u> v. <u>Connell</u>, 790 F. Supp. 50, 53-54 (D.R.I. 1992). A vague statute can be justified by no legitimate state interest. <u>See</u> <u>id.</u> Accordingly, the Court concludes, as it preliminarily determined in the September, 2008, Order, that § 14 fails to pass constitutional muster as it applies to this case.

### 3. Counter-Arguments

#### a. "Voters"

The Court is not dissuaded from its earlier reasoning by Galvin's arguments to the contrary. Galvin first contends that § 14 cannot apply to presidential elections because that statute clearly refers to officers selected by Massachusetts voters alone. He notes that 1) § 14 applies to "state officers" who, under the definitions of that term and of "state election," are "chosen by the voters" and 2) the term "voter" is elsewhere defined as "a registered voter." See M.G.L. c. 50, § 1.

Galvin argues that "a registered voter" refers only to a voter registered in Massachusetts and, therefore, "state officers" are those "chosen" by only voters registered in Massachusetts. Because the president and vice-president are chosen by voters nationwide, Galvin suggests that they cannot be deemed "state officers" and, hence, are not subject to § 14. The term "voter" is not, however, and cannot logically be expanded to mean "a registered voter in the Commonwealth," and Galvin provides no explanation as to why it should be so restricted.

#### b. Omission of "President" in the Definition of "State Officer"

Galvin also points out that the definition of "state officer" as set forth in M.G.L. c. 50, § 1 explicitly includes United States senators and representatives but is silent with respect to the president. He suggests, therefore, that that term

cannot refer to the president (and, by extension, § 14 cannot apply to the president).

In effect, he invokes the canon of statutory interpretation "expressio unius est exclusio alterius" pursuant to which the express mention of one thing in a statute implies the exclusion of another. That rule is "only a guide," United States v. Vonn, 535 U.S. 55, 65 (2002), and only applies when it resonates with legislative intent favoring exclusion, see Chevron U.S.A., Inc. v. Echazabal, 536 U.S. 73, 80 (2002) (refusing to apply the canon to a statute containing the phrase "may include"). Galvin's argument is, therefore, not altogether conclusive.

In any event, his interpretation of "state officer" (as including United States senators and representatives but not the president) does not remedy the inconsistent definitions of that term and "state election." As suggested above, a "state officer," as defined in § 1, is someone elected at a "state election," in which "national, state or county officers" are chosen. Thus, the president, undeniably a "national ... officer[]," could, for these purposes, be considered to fall within the ambit of "state officers." In any event, the statutory term is vague and ambiguous.

### c. Presidential Electors

In the alternative, Galvin suggests that, if § 14 applies to presidential elections at all, it must only apply to presidential

-10-

electors who are the persons actually "chosen at a state election" and, hence, it is the electors who must be considered to be "state officers."  In that context, Galvin argues that the statutory prerequisites for filling vacancies, as set forth in § 14, were not met in this case because none of the 12 electors who accepted nomination to support Phillies and Bennett died, withdrew or was found ineligible.

The plaintiffs respond that their complaint is with the Secretary's refusal to allow any substitution, whether for presidential nominees or for presidential electors.  Indeed, their ultimate goal was to substitute the names of Barr and Root in place of Phillies and Bennett on the ballot, regardless of how that was accomplished.  Moreover, the ambiguity with respect to whether § 14 applies to presidential nominees is equally applicable to presidential electors.  Galvin's argument concerning presidential electors is, therefore, unavailing.

### d.   Chapter 53, Section 6

Finally, Galvin devotes a major portion of the memorandum in support of his motion for summary judgment to defending the constitutionality of M.G.L. c. 53, § 6, even though the plaintiffs do not challenge it.  That statute provides that, in order to have their names appear on the ballot, candidates for president and vice president representing a political designation must obtain nomination papers (nominating 12 electors who have

pledged to vote for the presidential and vice-presidential candidates) signed by 10,000 voters and submitted to election officials on or before a certain date.  Galvin contends that it is irrelevant whether § 14 is constitutional so long as § 6 provides valid access to the ballot.

Section 6 does not, however, provide a means for substituting names on a ballot in the event that a candidate withdraws, dies or is found to be ineligible.  Such a right to substitute is guaranteed by the Equal Protection Clause of the Constitution to ensure that the names of the actual candidates appear on the ballot.  See Anderson v. Firestone, 499 F. Supp. 1027, 1230-31 (D.C. Fla. 1980) (holding that substitution of the name of the proper vice-presidential candidate on the ballot was constitutionally required when the presidential candidate had ultimately selected a running mate different from the one listed on nomination petitions).  In this case, § 6 did not provide a remedy for substituting the names of Barr and Root on the ballot when Phillies and Bennett had previously secured a spot but wished to cede it to the legitimate Libertarian nominees.

Thus, that statute did not protect ballot access for the candidates actually selected to represent the Libertarian Party or Massachusetts voters' right to vote for those candidates.  The lack of a substitution procedure does not serve the state interest in protecting ballot integrity or, indeed, any other

state interest and, accordingly, the presumed constitutionality of § 6 does not mitigate the constitutional infirmity of § 14.

### ORDER

In accordance with the foregoing, the plaintiffs' motion for summary judgment (Docket No. 37) is **ALLOWED** and, conversely, the defendant's motion for summary judgment (Docket No. 32) is **DENIED**.

**So ordered.**

                                        /s/ Nathaniel M. Gorton
                                        Nathaniel M. Gorton
                                        United States District Judge
Dated September 17, 2009