# United States Court of Appeals
## For the First Circuit

No. 09-2426

BOB BARR ET AL.,

Plaintiffs, Appellees,

v.

WILLIAM F. GALVIN, IN HIS OFFICIAL CAPACITY AS SECRETARY

OF THE COMMONWEALTH OF MASSACHUSETTS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Boudin, Ripple,[*] and Selya, Circuit Judges.

Amy Spector, Assistant Attorney General, with whom Martha Coakley, Attorney General, and Timothy Casey and Julie Goldman, Assistant Attorneys General, were on brief, for appellant.
Matthew C. Baltay, with whom Jennifer S. Behr, Amrish V. Wadhera, Foley Hoag LLP, and John Reinstein, American Civil Liberties Union of Massachusetts, were on brief, for appellees.

November 16, 2010

[*]Of the Seventh Circuit, sitting by designation.

SELYA, **Circuit Judge**.   In this appeal, the Secretary of State, on behalf of the Commonwealth of Massachusetts, challenges the district court's determination that Bob Barr and Wayne A. Root, the Libertarian Party's candidates for president and vice-president in the 2008 general election, were entitled to have their names placed on the statewide ballot even though they had not submitted nomination papers as required by state law.   While the particular election that gave rise to this controversy is over, the Secretary also challenges the district court's related determinations that (i) the Equal Protection Clause of the United States Constitution, U.S. Const. amend. XIV, § 1, affords a right of substitution in the circumstances of this case and (ii) Mass. Gen. Laws ch. 53, § 14, which governs the substitution of certain classes of candidates on the ballot, is unconstitutionally vague as applied to the substitution of non-party candidates for President and Vice-President of the United States.[1]   Barr, Root, and the other appellees defend the district court's resolution of these issues and, in doing so, argue that the result reached below was compelled by principles of constitutional law, statutory construction, and estoppel.

---

[1]  Throughout this opinion, we use the term "non-party candidates" as a shorthand for candidates who are not affiliated with a political party that is recognized as such under Massachusetts law.  See Mass. Gen. Laws ch. 50, § 1.

After careful consideration, we find that a live dispute remains.  With respect to that dispute, we conclude that the Equal Protection Clause does not require the Commonwealth to afford a substitution mechanism applicable to non-party candidates.  We further conclude that the relevant statute, while not unconstitutionally vague, is in need of interpretive clarification.  Pursuant to principles of <u>Pullman</u> abstention, that interpretation should be effected by the Massachusetts courts.  In light of this determination, the appellees' claims concerning the Secretary's prior pronouncements (including their estoppel claim) are either moot or likely to be rendered moot by the state courts' interpretation of the statutory scheme.  Accordingly, we reverse in part, vacate in part, and remand for further proceedings consistent with this opinion.

## I.   BACKGROUND

We start by rehearsing the relevant factual and procedural background.

Massachusetts recognizes as a "political party" any political organization that either (i) had a candidate for statewide office who garnered at least three percent of the vote in the most recent biennial election or (ii) has enrolled no less than one percent of the total electorate (as measured by registered voters).  Mass. Gen. Laws ch. 50, § 1.  At the time of the November 2008 general election, the Libertarian Party of Massachusetts (LPM)

did not satisfy either furculum of this test and, thus, the Commonwealth did not recognize it as a political party. Rather, the Commonwealth, in accordance with state law, see id., permitted the use of the Libertarian label as a "political designation." The Libertarian National Committee was not then and is not now recognized as a political party or political designation in Massachusetts.

Massachusetts law delineates procedures governing ballot access for presidential and vice-presidential candidates affiliated with recognized political parties. These procedures differ significantly from those that apply to other candidates. With respect to the presidential and vice-presidential candidates of a recognized political party, the party's state committee may choose its candidates and submit a form to the Secretary by the second Tuesday in September next preceding the election. That form identifies the candidates and sets out the names of the presidential electors selected by the committee. Id. ch. 53, § 8. This submission, in and of itself, qualifies the candidates for listing on the ballot. See id.

Other presidential and vice-presidential candidates must travel a different road: they must file nomination papers signed by at least 10,000 registered voters. Id. §§ 6-10. The papers must include the names of the presidential and vice-presidential candidates, and may also — but need not — identify a "political

designation" with which the candidates wish to be aligned.  Id.
§ 8.  In all events, the nomination papers must contain the names
of a slate of presidential electors, whose signatures on the papers
signify their support for the denominated candidates.  Id.  The
fact that non-party presidential and vice-presidential candidates
may receive an endorsement from a national political entity does
not confer any special ballot access rights.

     As a matter of procedure, signed non-party nomination
papers for presidential and vice-presidential candidates are to be
submitted to local canvassing officials.  Those officials then
certify the signatures, confirming that they belong to registered
voters.  Id. § 7.  In 2008, the deadline for submitting such
nomination papers to local canvassing boards was July 29.  See id.
In turn, the deadline for transmitting them to the Secretary was
August 26.  See id. § 10.[2]

     In July of 2007, George Phillies, acting in his capacity
as the chair of the LPM, sent an e-mail inquiry to the Secretary.
In it, Phillies inquired as to whether, if the presidential and
vice-presidential candidates identified on nomination papers
circulated in Massachusetts were not selected at the national
Libertarian nominating convention the following May, the names of

---

[2] Those who wish to obtain a global picture of how these dates
intersect may consult the so-called "Election Schedule" for the
2008 general election, published by the Secretary and available at
http://www.sec.state.ma.us/ele/elepdf/schedule_08.pdf.

the actual nominees could be substituted on the ballot.  In October of 2007, an aide to the Secretary responded that the Secretary's office could "prepare a form that allows members of the party to request the substitution of the candidate."

In early 2008, Phillies began to circulate nomination papers identifying himself as a presidential candidate and Chris Bennett as a vice-presidential candidate.  These papers named the requisite twelve electors.  The word "Libertarian" appeared in the space available for signifying a political designation.

The Libertarian National Committee held its convention in late May of 2008.  Phillies and Bennett competed unsuccessfully for the convention's endorsement as the Libertarian nominees for president and vice-president, respectively.  The convention endorsed Barr and Root for those offices.

Phillies and Bennett had gathered about 7,000 signatures from Massachusetts voters on nomination papers in support of their anticipated candidacies.  On May 29, 2008, Phillies e-mailed the Secretary's office, inquiring as to whether he and Bennett, should they qualify for the ballot, could be replaced by Barr and Root. The Secretary responded that such "substitution" was not permissible, but that Barr and Root still had nearly two months during which to secure the necessary signatures on their own behalf.  The Secretary likewise notified the Libertarian National Committee that the requested substitution was not authorized, but

that the usual statutory process of circulating and filing nomination papers was available as a means of getting Barr's and Root's names on the statewide ballot.

Despite the Secretary's declared position, Phillies continued to circulate nomination papers for a Phillies/Bennett ticket. He submitted these papers, which contained well over 10,000 valid signatures, in a timely manner. In contrast, Barr and Root did not submit any nomination papers, did not provide any evidence that they had secured the necessary signatures, and did not identify any presidential electors. Although Phillies and Bennett had met the requirements and were entitled to appear on the statewide ballot, nothing in Massachusetts law prevented two sets of candidates from appearing simultaneously with the same political designation.

On August 6, 2008, Barr, Root, the LPM, and the Libertarian National Committee (collectively, the appellees) filed suit in the United States District Court for the District of Massachusetts, challenging the Secretary's refusal to include Barr and Root on the statewide ballot. They sought a mandatory injunction compelling the Secretary to substitute Barr and Root for Phillies and Bennett and a declaration that the Secretary's refusal to allow the substitution infringed upon their constitutional rights to, among other things, free speech, freedom of association, and equal protection of the law.

-7-

On September 22, 2008, the district court granted the motion for a preliminary injunction. Barr v. Galvin (Barr I), 584 F. Supp. 2d 316, 322 (D. Mass. 2008). It concluded that the appellees would suffer irreparable harm were it to withhold relief. Id. at 321. Even though the initial complaint acknowledged that Massachusetts had no statutory mechanism specific to the kind of substitution that had been requested, the court concluded that section 14, which limns the process for filling vacancies for "state, city or town office" when candidates die, withdraw, or are declared ineligible following nomination, was "[t]he most relevant statute." Id. at 320. That provision, the court said, would "likely fail constitutional scrutiny" as applied to these facts. Id. at 321. Acting on these conclusions, the court ordered the Secretary to place the names of Barr and Root on the November 2008 ballot, in lieu of Phillies and Bennett, as candidates for president and vice-president. Id. at 318, 322.

The court did not enter a final judgment at that time, and the case remained pending throughout the 2008 election cycle. Barr and Root received less than one percent of the vote. That showing fell short of the three percent threshold needed to qualify the LPM for recognition as a political party in future elections. See Mass. Gen. Laws ch. 50, § 1. Nevertheless, a Libertarian candidate for United States Senator from Massachusetts received over three percent of the total votes for that office. Thus,

-8-

beginning in November of 2008, the LPM became a recognized political party in Massachusetts, with all the accouterments (including ballot access) that such recognition entails.

In the spring of 2009, the parties cross-moved for summary judgment. The district court denied the Secretary's motion and granted the cross-motion. Barr v. Galvin (Barr II), 659 F. Supp. 2d 225, 230 (D. Mass. 2009). In rendering this judgment, the court accepted without explicit discussion the parties' agreement that their dispute was still live. Id. at 227.

On the merits, the district court held that a right to substitute was guaranteed by the Equal Protection Clause "to ensure that the names of the actual candidates appear on the ballot." Id. at 230. Additionally, the court speculated that section 14 might provide a mechanism for substitution but declared that section unconstitutionally vague because it was unclear as to whether the reference to "state . . . office" encompassed the presidency, the vice-presidency, and/or presidential electors. Id. at 229-30. This timely appeal followed.

## II. ANALYSIS

We deal first with a threshold concern — mootness — and then turn to the substance of the parties' dispute.

### A. Mootness.

The Constitution "confines the jurisdiction of the federal courts to actual cases and controversies." ConnectU LLC v.

Zuckerberg, 522 F.3d 82, 88 (1st Cir. 2008) (citing U.S. Const. art. III, § 2, cl. 1).  This means, of course, that federal courts lack constitutional authority to decide moot questions.  North Carolina v. Rice, 404 U.S. 244, 245-46 (1971) (per curiam); United States v. Alaska S.S. Co., 253 U.S. 113, 116 (1920).  A case is not shielded from this proscription simply because a live controversy existed when it was brought.  Roe v. Wade, 410 U.S. 113, 125 (1973).  The rule is that "when an intervening event strips the parties of any legally cognizable interest in the outcome," a case, once live, is rendered moot (and, thus, non-justiciable).  ConnectU, 522 F.3d at 88.

Litigants cannot confer jurisdiction over a moot case by acquiescence or consent.  See Overseas Mil. Sales Corp. v. Giralt-Armada, 503 F.3d 12, 16 (1st Cir. 2007).  If an appellate court finds that the issues presented have become moot, it must dismiss the appeal.  Church of Scientology v. United States, 506 U.S. 9, 12 (1992); Cruz v. Farquharson, 252 F.3d 530, 533 (1st Cir. 2001); R.I. Ass'n of Realtors v. Whitehouse, 199 F.3d 26, 34 (1st Cir. 1999).  Thus, even though all the parties share the view that their dispute survived the 2008 general election, we are duty bound to inquire into mootness before proceeding further.  See Overseas Mil. Sales, 503 F.3d at 16; see also City of Erie v. Pap's A. M., 529 U.S. 277, 287 (2000).

-10-

Although the 2008 election is now a fait accompli, the mootness inquiry is more nuanced than it might appear at first blush.  The Secretary, with the support of the appellees, seeks to avoid the mootness bar through a claim that the issues in this case are "capable of repetition, yet evading review." S. Pac. Terminal Co. v. ICC, 219 U.S. 498, 515 (1911).  This is a well-established exception to general principles of mootness, but it is a narrow one.  Cruz, 252 F.3d at 534.  And although the exception has been applied frequently in election-related cases, see, e.g., Storer v. Brown, 415 U.S. 724, 737 n.8 (1974); Moore v. Ogilvie, 394 U.S. 814, 816 (1969), not every election case fits within its four corners.

The Supreme Court has described the scope of the exception, explaining that it applies where: "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." FEC v. Wis. Right To Life, Inc., 551 U.S. 449, 462 (2007) (quoting Spencer v. Kemna, 523 U.S. 1, 17 (1998)).  With respect to the second prong of this analysis, a party arguing against mootness must show either "a 'reasonable expectation' or a 'demonstrated probability' that 'the same controversy will recur involving the same complaining party.'" Id. at 463 (quoting Murphy v. Hunt, 455

U.S. 478, 482 (1982) (per curiam)); <u>accord</u> <u>CMM Cable Rep., Inc.</u> v. <u>Ocean Coast Props., Inc.</u>, 48 F.3d 618, 622 (1st Cir. 1995).

The second prong usually demands that it be the same party who is likely to face a similar conflict in the future.  To be sure, the case law admits of some imprecision on this point.  The main reason for this imprecision is that the "same complaining party" requirement, though satisfied, is not always explicitly stated.  <u>See</u> <u>Cruz</u>, 252 F.3d at 534 n.4 (making this observation).  The Supreme Court sometimes has addressed the same complaining party requirement without specifically flagging its significance to the mootness inquiry, <u>see</u>, <u>e.g.</u>, <u>Int'l Org. of Masters, Mates & Pilots</u> v. <u>Brown</u>, 498 U.S. 466, 473 (1991) (noting complaining party "has run for office before and may well do so again"), and in some instances, this requirement has been disregarded or diluted on the ground that the case was brought as a class action, <u>see</u>, <u>e.g.</u>, <u>Dunn</u> v. <u>Blumstein</u>, 405 U.S. 330, 331, 333 n.2 (1972); <u>see also</u> <u>Sosna</u> v. <u>Iowa</u>, 419 U.S. 393, 399 (1975) (explaining that certification of case as class action "significantly affects the mootness determination"); <u>Pallazola</u> v. <u>Rucker</u>, 797 F.2d 1116, 1129 (1st Cir. 1986) (noting that "[i]n the absence of a class action," the exception applies only where the same complaining party is likely to face the same situation again).

Despite this imprecision, the language of the Court's recent election-related cases indicates that the "capable of

repetition, yet evading review" exception depends in part upon a "same complaining party" showing.  See, e.g., Davis v. FEC, 128 S. Ct. 2759, 2769-70 (2008); Wis. Right to Life, 551 U.S. at 462; see also Norman v. Reed, 502 U.S. 279, 287-88 (1992).  We therefore abide by the "same complaining party" requirement here.

The facts of this case plainly satisfy the "evading review" prong of the exception.  Disputes concerning ballot access procedures are often time-sensitive, and the temporal parameters are sometimes too short to allow the issues to be fully litigated within a single election cycle.  See, e.g., Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 187 (1979); Moore, 394 U.S. at 816.  This case comes within that taxonomy.

The "capable of repetition" prong presents a more imposing barrier, but we believe that barrier has been surmounted. The LPM, though currently a recognized political party under Massachusetts law, had no candidate for Governor or United States Senator on the November 2010 statewide ballot in Massachusetts and, thus, may very well lose its status as a recognized political party.  While there are other means of maintaining or obtaining recognized party status, see Mass. Gen. Laws ch. 50, § 1, the LPM has never been able to secure party recognition through the use of such alternative means.  Given this history, we see no likelihood that the party will prove able to do so in the near future.  The LPM, then, has a reasonable expectation of being in a position to

-13-

complain about the lack of a substitution mechanism in future Massachusetts elections.  At any rate, we think that the parties — all of whom implore us to find that the case is not moot — should be given the benefit of the doubt.

In sum, we find that the appellees have shown a sufficient probability that the core events at issue in this case may recur and may again involve the LPM and/or the Libertarian National Committee.  Because we find that most aspects of this case satisfy both prongs of the "capable of repetition, yet evading review" exception, we conclude that a live dispute remains with respect to the constitutional questions at issue in this case.

## B.  **The Merits**.

We review an appeal from the entry of summary judgment de novo.  <u>Gastronomical Workers Union Local 610 & Metro. Hotel Assoc. Pension Fund</u> v. <u>Dorado Beach Hotel Corp.</u>, 617 F.3d 54, 60 (1st Cir. 2010); <u>Osediacz</u> v. <u>City of Cranston</u>, 414 F.3d 136, 139 (1st Cir. 2005).  In so doing, we assay the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  <u>Borges ex rel. S.M.B.W.</u> v. <u>Serrano-Isern</u>, 605 F.3d 1, 4 (1st Cir. 2010).  "We will affirm only if the record reveals 'no genuine issue as to any material fact' and 'the movant is entitled to judgment as a matter of law.'"  <u>Vineberg</u> v. <u>Bissonnette</u>, 548 F.3d 50, 55 (1st Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).  With

this standard of review in mind, we turn to the merits of the disputed claims.

      **1.  Vagueness.**  The appellees argue that "[t]he vagueness of the substitution statutory framework allows the Secretary to exert unconstitutional, unfettered discretion to allow or prohibit substitution during any given election."  Because this broad interpretive discretion has allowed the Secretary to take inconsistent positions regarding the availability of substitution, their thesis runs, non-party candidates and unrecognized political organizations are left without adequate guidance.  This plaint about excessive discretion boils down to an assertion that, with respect to substitution, the statutory scheme is void for vagueness.  The district court so held.  Barr II, 659 F. Supp. 2d at 229-30.

      Section 14 admittedly is unclear as to whether it applies to the kind of substitution requested by the appellees.  The statutory text contains two types of imprecision.  First, it refers to candidates seeking "state, city or town office," but provides no further elaboration as to the specific offices that are encompassed within that rubric.  This, in turn, leaves open to question whether candidates for presidential electors (who are, in one sense, candidates for a state office) and, by reference, presidential and vice-presidential candidates, come within its sweep.  Second, section 14 explains that vacancies "may be filled

by the same political party or persons who made the original nomination."  In the period leading up to the 2008 election, the LPM did not qualify for recognition as a political party under Massachusetts law.  Still, the reference to "persons who made the original nomination" arguably could apply to the LPM or, alternatively, to the individuals who signed the nomination papers qualifying Phillies and Bennett for inclusion on the ballot.  The text is opaque on this point.

Viewed against this backdrop, the appellees' complaint that the procedures governing substitution of candidates for president and vice-president are unclear strikes a responsive chord.  We are not convinced, however, that the lack of definition in the statutory text necessarily invalidates the statute on vagueness grounds.  See IMS Health Inc. v. Ayotte, 550 F.3d 42, 61 (1st Cir. 2008) ("[S]tatutes do not need to be precise to the point of pedantry, and the fact that a statute requires some interpretation does not perforce render it unconstitutionally vague."); Ridley v. MBTA, 390 F.3d 65, 93 (1st Cir. 2004) (similar).  Whatever its semantic shortcomings, section 14 seems susceptible to clarification by judicial interpretation.

This does not mean, however, that a federal court should undertake the task of parsing the statutory text to determine its applicability to the substitution of non-party presidential and vice-presidential candidates.  Especially given the lack of urgency

-16-

— the next presidential election is almost two full years away —
we think that the needed interpretation is a task for which the
state courts, as the ultimate arbiters of state-law questions, are
better suited.  See Acadia Ins. Co. v. McNeil, 116 F.3d 599, 604
(1st Cir. 1997) (explaining that state supreme court is "final
arbiter of the meaning of a statute of that state").

      Although we recognize that "[a]bstention from the
exercise of federal jurisdiction is the exception, not the rule,"
Colo. River Water Conserv. Dist. v. United States, 424 U.S. 800,
813 (1976), we are also mindful of the Supreme Court's sage counsel
that "[a]mong the cases that call most insistently for abstention
are those in which the federal constitutional challenge turns on a
state statute the meaning of which is unclear under state law,"
Harris Cnty. Comm'rs Court v. Moore, 420 U.S. 77, 84 (1975); accord
Baggett v. Bullitt, 377 U.S. 360, 377-78 (1964).  We believe that
Pullman abstention is appropriate in this case.

      Pullman abstention was conceived by the Supreme Court in
a case bearing the Pullman name.  See R.R. Comm'n of Tex. v.
Pullman Co., 312 U.S. 496, 499-502 (1941).  Pullman abstention "is
warranted where (1) substantial uncertainty exists over the meaning
of the state law in question, and (2) settling the question of
state law will or may well obviate the need to resolve a
significant federal constitutional question." Batterman v. Leahy,
544 F.3d 370, 373 (1st Cir. 2008); see also Babbitt v. United Farm

Workers Nat. Union, 442 U.S. 289, 307-08 (1979) (noting that abstention may be appropriate in cases where "it is evident that the [state] statute is reasonably susceptible of constructions that might undercut or modify appellees' vagueness attack . . . [and] that an authoritative construction of the . . . provision may significantly alter the constitutional questions requiring resolution"); Zwickler v. Koota, 389 U.S. 241, 251 (1967) (emphasizing that Pullman abstention is appropriate when a state statute, never interpreted by a state court, is "fairly subject to an interpretation which will avoid or modify the federal constitutional question").

In the case at hand, an "uncertain issue of state law [turns] upon a choice between one or several alternative meanings of [the] state statute." Babbitt, 442 U.S. at 308 (quoting Baggett, 377 U.S. at 378). The Massachusetts courts should therefore be afforded the opportunity to address, in the first instance, the question of the statute's application to non-party presidential and vice-presidential candidates. See, e.g., Harris Cnty., 420 U.S. at 84.

The district court premised its conclusion that section 14 is void for vagueness on the fact that it "leaves the determination of whether that statute is applicable to presidential and vice-presidential nominees positively ambiguous," Barr II, 659 F. Supp. 2d at 229, and went on to state that where the meaning of

-18-

a statute is unclear, that statute may be found unconstitutionally vague.  Id.  That statement goes too far.  The mere fact that a statute requires interpretation does not necessarily render it void for vagueness.  Once the state courts clarify section 14's relevance (if any) to substitution of presidential and vice-presidential candidates, such a clarification, however it comes out, would end the "void for vagueness" argument.  Thus, both of the preconditions for Pullman abstention are satisfied in this case.[3]

       **2.  Equal Protection.**  Beyond their claim regarding the uncertainty of the Massachusetts statutory scheme, the basic thrust of the appellees' case is that substitution of non-party candidates for president and vice-president is required as a matter of equal protection.  Indeed, they succeeded in persuading the district court that they were entitled to this substitution even if no provision of Massachusetts law explicitly authorized it.  Id. at 230.  In the appellees' words, "the Secretary discriminates arbitrarily" between recognized political parties

---

    [3] Though the existence of a pending state court action is sometimes considered as a factor in favor of abstention, the lack of such pending proceedings does not necessarily prevent abstention by a federal court.  Duncan v. Poythress, 657 F.2d 691, 697 (1st Cir. 1981).  As noted above, the next presidential election is nearly two years distant, and thus we find that any delay in obtaining relief pending state court adjudication would impose no onerous burden upon the parties.  See Bonas v. Town of N. Smithfield, 265 F.3d 69, 76 n.5 (1st Cir. 2001).

and non-parties by refusing to allow substitution of non-party candidates for president and vice-president.

We freely acknowledge that the right to vote is central to the operation of a democratic society. Consequently, "any restrictions on that right strike at the heart of representative government." Werme v. Merrill, 84 F.3d 479, 483 (1st Cir. 1996) (quoting Reynolds v. Sims, 377 U.S. 533, 555 (1964)). Some substantial regulation of elections is necessary, however, to ensure that they are fair, honest, and orderly. See, e.g., id. (citing Storer, 415 U.S. at 730).

To be sure, the fact that states have considerable discretion in establishing the procedures that govern ballot access does not mean that every restriction on ballot access is permissible under the Constitution. Ballot access restrictions that fall unequally on similarly situated candidates or parties may threaten the right to equal protection of the laws guaranteed by the Fourteenth Amendment. Libertarian Party of Me. v. Diamond, 992 F.2d 365, 370 (1st Cir. 1993).

A mere demonstration that a state provision distinguishes among groups (such as candidates affiliated with a recognized political party and those not so aligned) is insufficient by itself to establish an equal protection violation. Rather, a claim of unconstitutionality must be grounded in a showing of substantial discrimination. "Statutes create many classifications

which do not deny equal protection; it is only 'invidious discrimination' which offends the Constitution." Am. Party of Tex. v. White, 415 U.S. 767, 781 (1974) (quoting Ferguson v. Skrupa, 372 U.S. 726, 732 (1963)); see also Clements v. Fashing, 457 U.S. 957, 967 (1982) ("Classification is the essence of all legislation, and only those classifications which are invidious, arbitrary, or irrational offend the Equal Protection Clause of the Constitution." (citing Williamson v. Lee Optical Co., 348 U.S. 483, 489 (1955))).

In recognition of the competing interests at stake where ballot access regulations are concerned, the Supreme Court has developed a flexible "sliding scale" approach for assessing the constitutionality of such restrictions. Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997); Burdick v. Takushi, 504 U.S. 428, 432-34 (1992). Under this approach, when the burden imposed by a ballot access regulation is heavy, the provision must be narrowly tailored to promote a compelling state interest. Timmons, 520 U.S. at 358. Reasonable, nondiscriminatory restrictions, however, need be justified only by legitimate regulatory interests. Id. A court evaluating a challenge to a state ballot access regulation must, therefore, conduct its inquiry by weighing "the character and magnitude of the asserted injury" to the complaining party's constitutional rights and "evaluat[ing] the precise interests put forward by the State as

justifications for the burden imposed." Werme, 84 F.3d at 483 (quoting Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)); see also Libertarian Party of Me., 992 F.2d at 370.

The Massachusetts ballot access provisions at issue here are nondiscriminatory. They do not specifically differentiate among Democrats, Republicans, Libertarians, Mugwumps, or candidates affiliated with any other political organization. In other words, all political organizations are subject to the same criteria for determining whether they qualify for recognition as political parties and, thus, for the array of rights indigenous to recognized political parties under Massachusetts law. See Mass Gen. Laws ch. 50, § 1. These criteria are, essentially, twofold.

One avenue to recognition depends on a demonstration of a proven ability to attract votes. Under the statutory scheme, the LPM has essentially the same opportunity as any other party to field attractive candidates, promote their candidates, and convince voters to get on board. Distinguishing among political organizations on the basis of success in past elections "is not per se invidiously discriminatory." Werme, 84 F.3d at 484 (citing Am. Party of Tex., 415 U.S. at 781). The LPM had the same chance as any other political organization to qualify as a recognized political party in this way and, in fact, did so in the 2008 election.

The second avenue for qualification as a recognized political party under Massachusetts law is through enrollment of at least one percent of the voters registered in Massachusetts. Where, as here, the necessary number of enrolled voters required to achieve party recognition is reasonable,[4] that methodology constitutes an appropriate screen.  Cf. Jenness v. Fortson, 403 U.S. 431, 442 (1971) (approving provision requiring prospective candidate to obtain signatures from five percent of eligible voters).

We add that the Massachusetts voter enrollment provision is essentially an alternate means by which the state can ascertain whether a political organization has demonstrated sufficient support to warrant official recognition as a party.  See, e.g., Libertarian Party of Me., 992 F.2d at 372.  Nothing prevented registered Massachusetts voters from aligning themselves with the LPM, and, thus, the LPM had a full and fair chance to avail itself of this avenue for becoming a recognized political party.

To sum up, equality of opportunity exists here.  And as we said in Werme, 84 F.3d at 485, "equality of opportunity — not equality of outcomes — is the linchpin of what the Constitution requires in this type of situation."

---

[4] The appellees do not challenge the reasonableness of the number of enrolled voters required under Massachusetts law.

It is also important to note that the time available to Barr and Root when they were directed by the Secretary (and, for that matter, by state law) to procure the signatures necessary to comply with section 6 was not so short as to impose an unreasonable burden. Barr and Root had approximately 60 days after the national convention and before the filing deadline during which to secure the 10,000 required signatures, and the Supreme Court has approved analogous time frames for collecting signatures as not unduly burdensome. See, e.g., Am. Party of Tex., 415 U.S. at 786 (finding that period of 55 days was not "an unduly short time for circulating . . . petitions" and noting that time frame would have required that signatures be collected at a rate of no more than 400 per day to satisfy the statutory requirement prior to the deadline).

The modest nature of the burden is confirmed by the fact that, during the same time period, Phillies and Bennett were able to secure approximately 8,000 signatures on their own nomination papers, ultimately submitting many more than the 10,000 signatures needed to qualify for the ballot. While a state "may not act to maintain the 'status quo' by making it virtually impossible for any but the two major parties to achieve ballot positions for their candidates," Clements, 457 U.S. at 965, the regime challenged here clearly had no such effect.

-24-

Having evaluated the nature of the ballot access restrictions at issue here and the extent of the burdens imposed, we have no doubt as to the appropriate level of scrutiny to be applied. We conclude that there need be only a rational basis undergirding the regulation in order for it to pass constitutional muster. See, e.g., Timmons, 520 U.S. at 358-59.

That threshold is satisfied. In defense of his refusal to grant substitution to non-party presidential and vice-presidential candidates, the Secretary points to the state's interests in using "substantial support" requirements as a means of protecting "the integrity of elections by avoiding overloaded ballots and frivolous candidacies, which diminish victory margins, contribute to the cost of conducting elections, confuse and frustrate voters, . . . and may ultimately discourage voter participation in the electoral process." Libertarian Party of Me., 992 F.2d at 371. This, in itself, justifies the regulations at issue here. It is settled beyond hope of contradiction that states have a legitimate interest in ensuring that a candidate makes a preliminary showing of a substantial measure of support as a prerequisite to appearing on the ballot. See, e.g., Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986); Anderson, 460 U.S. at 788-89; Am. Party of Tex., 415 U.S. at 782; Jenness, 403 U.S. at 442. Logically, this interest is advanced by the Secretary's refusal to grant to non-party candidates the right to

substitution in circumvention of the state's signature requirements. Granting such substitution would effectuate an end-run around the signature requirement — a requirement that allows the state to ascertain whether a given candidate has enough support to warrant inclusion on the ballot.

In light of the state's legitimate interest in ensuring that the candidates who appear on the statewide ballot have demonstrable support among the voting public, the modest burden imposed upon non-party candidates by requiring them to secure signatures, rather than piggy-backing upon signatures collected for other candidates, is not so onerous as to present an equal protection problem vis-à-vis candidates affiliated with recognized political parties. Cf. Jenness, 403 U.S. at 440-41 ("We cannot see how [the state] has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths [to appearing on the ballot], neither of which can be assumed to be inherently more burdensome than the other."). The appellees' equal protection challenge therefore fails.

3. **Other Claims.** The distance we have travelled to this point does not end our odyssey. The parties joust over a final set of claims, which implicate alleged inconsistencies in the Secretary's position regarding the availability of substitution. We need not linger long over any of these claims.

First, the appellees argue that the Secretary should be estopped from declaring that substitution of non-party presidential and vice-presidential candidates is not the policy of his office. To ground this argument, they rely on a communication received from the Secretary's office in 2007, which informed them that the Secretary could provide a form through which substitution could be requested.

It is far from clear that the Secretary has adopted inconsistent positions. After all, a statement that a party would be permitted to <u>request</u> substitution in certain circumstances falls short of an assurance that substitution would be <u>allowed</u> if requested. Here, however, we need not decide whether or not the Secretary heretofore has taken inconsistent positions.

In the course of this litigation, the Secretary has made his current position crystal clear: substitution is not available in the circumstances presented by the appellees. That position, as we have pointed out, depends on the interpretation of state law. There is no election on the horizon, and the appellees have ample time to litigate the validity of the Secretary's position in the state courts. In light of these circumstances and the Secretary's plainly articulated position, the appellees cannot reasonably continue to rely on any earlier inconsistency.

In any event, a definitive state-court interpretation of the meaning of the statutory scheme will provide non-party

candidates with concrete guidance on the availability vel non of substitution. There is plenty of time in which to obtain such an interpretation: the run-up to the next presidential election has barely begun. Accordingly, because there is no reasonable likelihood of recurrence, the estoppel claim is moot. Cf. Spencer, 523 U.S. at 18 (finding claim moot because petitioner had not "demonstrated a reasonable likelihood that he will once again be paroled and have that parole revoked"); Oakville Dev. Corp. v. FDIC, 986 F.2d 611, 615 (1st Cir. 1993) (finding claim moot because it is "highly unlikely that appellant will again secure a mortgage with a federally insured bank that then fails, prompting FDIC involvement and ensuing foreclosure").

Second, and relatedly, the appellees complain that the ambiguities in the statutory scheme have allowed the Secretary to grant a right of substitution to non-party candidates in prior elections, yet deny such a right to the appellees in 2008. The appellees suggest that this erratic behavior creates an equal protection problem vis-à-vis other "unrecognized" political parties and/or non-party candidates.

The premise on which this suggestion rests is unconvincing. We have examined the examples proffered by the

appellees and believe that none of the affected parties and/or candidates appears to be situated similarly to the appellees.[5]

Regardless, any historical variations in treatment will be rendered irrelevant once the Massachusetts courts have clarified the way in which state law operates.  Such clarification will help to define the bounds of the Secretary's discretion to permit or deny substitution, limiting his capacity to adopt arguably haphazard policies across multiple election cycles.  Because state-court construction of the statutory scheme is likely to eliminate the kinds of variations on which this equal protection claim is premised, we think it prudent to forgo evaluation of it pending resolution of the anticipated state-court action.  See Bath Mem'l Hosp. v. Me. Health Care Fin. Comm'n, 853 F.2d 1007, 1016 (1st Cir. 1988) (finding that Pullman abstention may be appropriate in respect to claim that state commission's lack of decision-making standards created equal protection problem, where state court might read state law as importing standards, in which case claim would be significantly altered or mooted); cf. El Dia, Inc. v. Hernández Colón, 963 F.2d 488, 494 (1st Cir. 1992) ("[D]eclaratory judgments concerning the constitutionality of government conduct will almost

---

[5] These prior instances involved the substitution of a vice-presidential candidate only (with the written consent of the slate of electors) and the substitution of candidates who could not otherwise have gotten on the ballot because their party's nominating convention did not take place until after the deadline had passed for submitting nominating papers.

always be inappropriate when the constitutional issues are freighted with uncertainty and the underlying grievance can be remedied for the time being without gratuitous exploration of uncharted constitutional terrain.").

**III.  CONCLUSION**

We need go no further.  For the reasons elucidated above, we reverse the decision of the district court on the equal protection claim, vacate its decision and judgment in all other respects, and <u>remand</u> to the district court with instructions to <u>abstain</u> on the "void for vagueness" claim and <u>dismiss</u> what remains of the action without prejudice.  All parties shall bear their own costs.

**<u>Reversed in part; vacated in part; and remanded</u>**.